[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12696
_____

D.C. Docket No. 1:13-cv-00521-CG-C


ETERNAL WORD TELEVISION NETWORK, INC.,

Plaintiff - Appellant,

STATE OF ALABAMA,

Plaintiff,

versus

SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
SECRETARY OF THE U.S. DEPARTMENT OF LABOR,
U.S. DEPARTMENT OF LABOR,
SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY,
U.S. DEPARTMENT OF THE TREASURY,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Alabama
_____

_____

Nos. 14-12890; 14-13239
_____

D.C. Docket No. 1:12-cv-03489-WSD

THE ROMAN CATHOLIC ARCHDIOCESE
OF ATLANTA,
an association of churches and schools,
THE MOST REVEREND WILTON D. GREGORY,
and his successors, Archbishop of the Roman
Catholic Archdiocese of Atlanta,
CATHOLIC CHARITIES OF THE ARCHDIOCESE
OF ATLANTA, INC.,
a Georgia non-profit corporation,
THE ROMAN CATHOLIC DIOCESE OF SAVANNAH,
an ecclesiastical territory,
THE MOST REVEREND JOHN HARTMAYER,
and his successors, Bishop of the Roman
Catholic Diocese of Savannah, et al.,

Plaintiffs - Appellees,

versus

SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,
U.S. DEPARTMENT OF LABOR,
U.S. DEPARTMENT OF TREASURY,
SECRETARY, U.S. DEPARTMENT OF LABOR,
SECRETARY, U.S. DEPARTMENT OF TREASURY,

Defendants - Appellants.

2

———————————————

Appeals from the United States District Court
for the Northern District of Georgia

———————————————

(February 18, 2016)

Before TJOFLAT, JILL PRYOR and ANDERSON, Circuit Judges.

JILL PRYOR, Circuit Judge:

The plaintiffs in these consolidated appeals challenge the regulations implementing what is known as the "contraceptive mandate" of the Affordable Care Act ("ACA")—the requirement that employers provide health insurance coverage for preventive care (including contraception) to women.[1]  Specifically, the plaintiffs argue that the regulations' accommodation for nonprofit organizations with a religious objection to providing contraceptive coverage violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*  They claim that the accommodation substantially burdens their religious exercise in violation of RFRA by forcing them to take actions that cause their health plan administrators to provide contraceptive coverage and to maintain a health plan that serves as a conduit for contraceptive coverage.  We reject the

———————————————

[1] We consider in this opinion the following district court orders: *Eternal World Television Network, Inc. v. Burwell*, 26 F. Supp. 3d 1228 (S.D. Ala. 2014); *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 2441742 (N.D. Ga. May 30, 2014); and *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014).  The government filed separate appeals from the two orders in *Roman Catholic Archdiocese*, which were consolidated before this Court.

3

plaintiffs' claims because we conclude that the regulations do not substantially burden their religious exercise and, alternatively, because (1) the government has compelling interests to justify the accommodation, and (2) the accommodation is the least restrictive means of furthering those interests.

Eternal Word Television Network ("EWTN"), the plaintiff in the first appeal, also raises several First Amendment challenges to the accommodation. Because the accommodation is a neutral, generally applicable law that does not discriminate based on religious denomination, we reject EWTN's challenges under the Establishment and Free Exercise Clauses. We also reject EWTN's challenge under the Free Speech Clause because, as discussed below, any speech restrictions that may flow from the accommodation are justified by a compelling governmental interest and are thus constitutional.

## I.    BACKGROUND

### A.    The Affordable Care Act and the Contraceptive Mandate

Enacted in 2010, the ACA requires group health insurance plans to provide a minimum floor of coverage without imposing cost sharing (such as deductibles, co-payments, or co-insurance) on plan participants and beneficiaries. 42 U.S.C. § 300gg-13(a). If an employer fails to provide such coverage in its group employee health plan, it is subject to penalties in the form of a tax of $100 per day per affected person. 26 U.S.C. § 4980D(b)(1). The Women's Health Amendment

4

to the ACA added to the minimum coverage requirements a mandate that group health plans provide women with coverage for preventive care and screenings. 42 U.S.C. § 300gg-13(a)(4). The requirement was intended in part to "get[] rid of, or minimiz[e], high copays and high deductibles that are often overwhelming hurdles for women to access screening programs." 155 Cong. Rec. S11987 (Nov. 30, 2009) (statement of Sen. Mikulski). The ACA tasked the Health Resources and Services Administration ("HRSA"), an agency of the Department of Health and Human Services ("HHS"), with promulgating comprehensive guidelines determining which preventive services and screenings would be required. 42 U.S.C. § 300gg-13(a)(4). HHS commissioned the Institute of Medicine ("IOM") to assist with HRSA's development of the guidelines.

The IOM released a full report in 2011 detailing its study of various preventive services and its recommendations for coverage under the mandate. Inst. of Medicine, Clinical Preventive Services for Women: Closing the Gaps (2011) ("IOM Report"). The IOM Report discussed at length the positive public health outcomes associated with reducing unintended pregnancies and giving women more control over birth spacing. The United States has a much higher rate of unintended pregnancies—49 percent of pregnancies in 2001—than other developed countries. *Id.* at 102. Unintended pregnancies correlate with health problems both for women who experience such pregnancies and for children born

5

as a result of them. *Id.* at 103. And because women may not realize immediately that they are pregnant, "their entry into prenatal care may be delayed[;] they may not be motivated to discontinue behaviors that present risks for the developing fetus; and they may experience depression, anxiety, or other conditions." *Id.* Unintended pregnancies also frequently end in abortion. *Id*. at 102.[2]

The IOM Report also noted the health consequences of pregnancies occurring too closely together in time. For infants, "[s]hort interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small for gestational age births." *Id*. at 103. For women, both pregnancy spacing and the ability to avoid pregnancy may significantly affect their health because, among other reasons, some "women with certain chronic medical conditions (e.g., diabetes and obesity) may need to postpone pregnancy until appropriate weight loss or glycemic control has been achieved." *Id.* Pregnancy is also contraindicated for some women with serious medical conditions, for example, pulmonary hypertension or Marfan syndrome.[3] *Id*. at 103-04. The IOM Report also found

---

[2] A 2013 report from the Centers for Disease Control and Prevention estimated that 18 percent of all pregnancies in the United States ended in abortion and noted that "unintended pregnancy precedes nearly all abortions." Karen Pazol, et al., Centers for Disease Control & Prevention, Abortion Surveillance—United States, 2010 (Nov. 29, 2013), http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6208a1.htm. The IOM Report noted that in 2001, 42 percent of unintended pregnancies in the United States were terminated by abortion. IOM Report at 102.

[3] Marfan syndrome is a genetic disorder that affects the body's connective tissue. Pregnancy can be difficult for women with the condition because of the additional strain

that "greater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally." *Id*. at 105.

Pursuant to its statutory authority, HRSA released binding guidelines, based on the IOM Report, that require coverage for "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." U.S. Dep't of Health & Human Servs., Health Res. & Servs. Admin., *Women's Preventive Services Guidelines* ("HRSA guidelines"), http://www.hrsa.gov/womensguidelines (last visited Feb. 12, 2016); *see also* 77 Fed. Reg. 8725, 8725-26 (Feb. 15, 2012) (quoting the language in the HRSA guidelines regarding coverage). Implementing regulations developed by the Department of Labor, the Department of the Treasury, and HHS (collectively, the "Departments") reiterate the contraceptive mandate's requirement that health plans cover all services listed in the HRSA guidelines. 26 C.F.R. § 54.9815-2713(a)(1)(iv) (Treasury Regulation); 29 C.F.R § 2590.715-2713(a)(1)(iv) (Labor Regulation); 45 C.F.R. § 147.130(a)(1)(iv) (HHS Regulation).[4]

---

pregnancy places on the cardiovascular system. Nat'l Heart, Lung, & Blood Inst., *What is Marfan Syndrome?* (Oct. 1, 2010), http://www.nhlbi.nih.gov/health/health-topics/topics/mar/.

[4] The Departments have jointly developed regulations carrying out the ACA. To be concise, whenever possible we cite only to the regulations issued by HHS, codified at 45 C.F.R. pt. 147, and not to the corresponding identical regulations issued by the Departments of Labor and the Treasury.

Mindful of religious freedom and the importance of respect for "the unique relationship between a house of worship and its employees in ministerial positions," the Departments promulgated interim regulations that gave HRSA discretion to exempt from the contraceptive mandate certain group health plans established or maintained by religious employers. *See* 76 Fed. Reg. 46621, 46623 (Aug. 3, 2011). The Departments defined "religious employer" by incorporating the Internal Revenue Service's definition of a church or integrated auxiliary from 26 U.S.C. § 6033(a)(3)(A)(i) and (iii). 45 C.F.R. § 147.130(a)(1)(iv)(B) (2011). The definition also required a religious employer to have a religious purpose and to both serve and employ primarily persons who share the religious tenets of the organization. *Id*. Exercising the discretion the regulations provided, HRSA amended its guidelines to exempt religious employers from the contraceptive mandate. The guidelines, issued on August 1, 2011, required compliance beginning on August 1, 2012. *See id.* § 147.130(b)(1).

The Departments finalized the implementing regulations in February 2012. *See* 77 Fed. Reg. 8725. At the same time, the Departments established a temporary safe harbor from the contraceptive mandate for nonprofit organizations with religious objections to providing contraceptive coverage. *See* Dep't of Health & Human Servs., *Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Health Plans & Group Health Insurance Issuers with Respect to the*

8

*Requirement to Cover Contraceptive Services Without Cost Sharing* (Feb. 10, 2012).  The safe harbor remained in effect for the 2012 plan year, ending on August 1, 2013.  *See id.* at 2.

The Departments intended to use the safe harbor period to "expeditiously develop and propose changes to the final regulations implementing" the contraceptive mandate.  77 Fed. Reg. 16501, 16503 (Mar. 21, 2012).  The changes to the regulations needed to "meet two goals—accommodating non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing."  *Id.*  In March 2012, the Departments began the rulemaking process and solicited comments on potential regulations that could achieve these two goals.  *Id.* at 16501.

At the conclusion of the rulemaking process in July 2013, the Departments promulgated revised regulations that retained HRSA's authority to exempt religious employers.  *See* 78 Fed. Reg. 39870 (July 2, 2013).  The same day, HRSA released revised guidelines that tracked the Departments' changes to the religious employer exemption.  The final regulations simplified the definition of a "religious employer," making the term coextensive with the IRS's statutory definition and removing the additional qualifications regarding a religious

9

employer's mission, programs, and employees.  45 C.F.R. § 147.131(a) (2013); *see also* 78 Fed. Reg. at 39873-74.  Religious employers remained categorically exempt from the contraceptive mandate out of "respect [for] the religious interests of houses of worship and their integrated auxiliaries."  78 Fed. Reg. at 39874.  The Departments noted that the exemption did not undermine their goal of making contraceptive coverage available because religious employers and their integrated auxiliaries "are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan."  *Id.*

The revised regulations, which took effect on Aug. 1, 2013, added an accommodation for organizations that do not qualify as religious employers under the exemption.  *See* 45 C.F.R. § 147.131(b) (2013).  So long as an organization is a nonprofit entity holding itself out as a religious organization and has a religious objection to providing contraceptive coverage (we refer to such entities as "eligible organizations"), it may opt out of the contraceptive mandate.  *Id.*[5]

---

[5] Under 45 C.F.R. § 147.131(b), an organization is eligible for the accommodation if:

(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)    (i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

Eligible organizations can take advantage of the accommodation via one of

two procedures.  The first procedure requires the organization to complete

Employee Benefits Security Administration Form 700 ("Form 700").  *See* EBSA

Form 700–Certification (Aug. 2014),

http://www.dol.gov/ebsa/preventiveserviceseligibleorganizationcertificationform.doc.

[6]  To complete the two-page form, the eligible organization must provide its name

and the name, title, and contact information of the individual signing the form on

behalf of the organization.  The person signing the form must certify that the

organization "has a religious objection to providing coverage for some or all of any

contraceptive services that would otherwise be required to be covered."  *Id.*

---

(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (c) of this section.  The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.  The self-certification or notice must be executed by a person authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

[6] Form 700 is included as the appendix to this opinion.

The form's recipient depends on the type of health plan the eligible organization maintains. Employers can provide health benefits either through an insured health plan or a self-insured health plan.[7] *See* Cong. Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 6 (2008). If the eligible organization has an insured plan, it gives Form 700 to the insurance company that provides its health plan ("plan provider"); if the organization has a self-insured plan, it gives Form 700 to its third-party administrator ("TPA"). The plaintiffs in both cases before us provide health benefits to their employees through self-insured group health plans, and all employ TPAs to administer their plans.

Alternatively, an eligible organization may directly notify HHS of its religious objection to complying with the contraceptive mandate. This more recently developed method of taking advantage of the accommodation arose from the United States Supreme Court's order granting a preliminary injunction in *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). After the regulations concerning the exemption and accommodation procedures were finalized, the Supreme Court in *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751, 2759-60 (2014), extended the accommodation for nonprofit religious organizations to

_____

[7] For insured health plans, the employer contracts with an insurance company that administers the group plan and pays claims. For self-insured plans, the financial risk of providing health insurance lies with the organization itself; the organization directly pays for the plan participants' and beneficiaries' claims. Usually, organizations with self-insured plans hire a third party to handle administrative tasks, such as developing provider networks and processing claims.

12

closely held for-profit corporations whose owners have religious objections to complying with the contraceptive mandate. Three days after the *Hobby Lobby* decision was issued, the Supreme Court in *Wheaton College* granted a request for a preliminary injunction pending appellate review to a plaintiff challenging the accommodation itself under RFRA, the same challenge the plaintiffs mount here. *Wheaton Coll.*, 134 S. Ct. at 2807. The Supreme Court's order enjoined HHS from enforcing the accommodation procedure against the college, so long as the college "inform[ed] the Secretary of Health and Human Services in writing that it is a non-profit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services." *Id.* The Supreme Court warned, however, that the injunction order "should not be construed as an expression of the Court's views on the merits." *Id.*[8]

In response to the order in *Wheaton College*, the Departments issued interim final regulations in August 2014 to allow an eligible organization to opt out by sending a letter to HHS, instead of giving Form 700 to its plan provider or TPA. 79 Fed. Reg. 51092, 51094-95 (Aug. 27, 2014); *see* Ctr. for Medicare & Medicaid Servs., *Model Notice*, https://www.cms.gov/CCIIO/Resources/Regulations-and-

---

[8] The Seventh Circuit recently resolved Wheaton College's appeal, affirming the district court's denial of the college's request for a preliminary injunction. *Wheaton Coll. v. Burwell*, 791 F.3d 792 (7th Cir. 2015).

13

Guidance/Downloads/Model-Notice-8-22-14.pdf (last visited Feb. 12, 2016).[9]

There is no prescribed format for the letter, but it must include:

> the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on its sincerely held religious beliefs to coverage of some or all contraceptive services, as applicable (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type . . . ; and the name and contact information for any of the plan's third party administrators and health insurance issuers.

45 C.F.R. § 147.131(c)(1)(ii).

The regulations became final, without substantial changes, in a set of new rules effective on September 14, 2015.  80 Fed. Reg. 41318 (July 14, 2015).  Under the current rules, if an eligible organization directly notifies HHS of its intent to opt out of the contraceptive mandate, the government then alerts the organization's health plan provider or TPA that the organization has opted out and describes the plan provider's or TPA's resulting obligations.  *See* 26 C.F.R. § 54.9815-2713A(b)(1)(ii)(B), (c)(1)(ii).

For insured plans, once an eligible organization avails itself of the accommodation, the plan provider must (1) "[e]xpressly exclude contraceptive

---

[9] The interim final regulations also removed a provision (known as the non-interference provision) requiring that eligible organizations "'must not, directly or indirectly[,] seek to interfere with a third party administrator's arrangements to provide or arrange for separate payments for contraceptive services,' and 'must not, directly or indirectly, seek to influence a third party administrator's decision to make any such arrangements.'"  79 Fed. Reg. at 51095 (quoting 26 C.F.R. § 54.9815-2713A(b)(1)(iii); 29 C.F.R. § 2590.715-2713A(b)(1)(iii)).

coverage from the group health insurance coverage" and (2) "[p]rovide separate payments for any contraceptive services required to be covered" for the plan participants and beneficiaries.  45 C.F.R. § 147.131(c)(2)(i).

For self-insured plans, the regulations provide that when an eligible organization invokes the accommodation, its TPA is designated as the plan administrator under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(16), with respect to contraceptive services.  Under the regulations, the TPA is designated as the plan administrator in one of two ways.  If the eligible organization provides a copy of Form 700 to its TPA, then the regulations treat the form "as a designation of the [TPA] as the plan administrator" for ERISA purposes.  29 C.F.R. § 2510.3-16(b).  If the eligible organization instead notifies HHS of its intent to opt out, then the Department of Labor notifies the TPA that it shall be the plan administrator with respect to contraceptive services for ERISA purposes.  *Id.*

Upon receiving notification, the TPA has the option of terminating its contractual relationship with the eligible organization.[10]  *See* 26 C.F.R. § 54.9815-

---

[10] If the TPA terminates the relationship, the organization must (1) contract with a new TPA to administer its self-insured plan, (2) convert to an insured plan by contracting with a plan provider, or (3) administer the plan itself.  If the eligible organization contracts with a new TPA, then it remains subject to the mandate and must provide contraceptive coverage, seek an accommodation, or pay a penalty.  Alternatively, the organization could restructure its plan and contract with a plan provider that would assume the risk of providing health insurance (that is, change from a self-insured to an insured plan).  In this scenario, the organization would have to

15

2713A(b)(2). If it remains as the TPA, then it must provide (or arrange for another insurer to provide) contraceptive benefits to participants and beneficiaries of the self-insured plan. *Id.*; 29 C.F.R. § 2510.3-16(c).[11]

Significantly, plan providers and TPAs "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries." 26 C.F.R. § 54.9815-2713A(c)(2)(i); 45 C.F.R. § 147.131(c)(2)(ii).[12] Plan providers "must segregate premium revenue collected from the eligible organization from the monies used to provide payments for contraceptive

comply with the mandate, seek an accommodation, or pay a penalty. Finally, the organization could continue with its self-insured plan without a TPA, meaning the organization would assume responsibility for administering claims. Although the Departments are unaware of the existence of a single self-insured plan without a TPA, they have created a safe harbor that excuses such a plan from complying with the contraceptive mandate so long as it annually notifies HHS that it has no TPA and plan participants and beneficiaries that contraceptive coverage is not provided. The Departments will provide this safe harbor while considering an additional accommodation. 78 Fed. Reg. at 39880-81.

[11] Self-insured plans run by houses of worship and certain organizations controlled by or associated with a house of worship, known as "church plans," are not subject to the provisions of ERISA unless they elect otherwise. *See* 26 U.S.C. §§ 410(d), 414(e). The government lacks authority to compel the TPA of a church plan not subject to ERISA to provide contraceptive coverage. *See* 29 U.S.C. § 1003(b)(2). Nonetheless, the TPA for a church plan may voluntarily provide contraceptive services; the government incentivizes these TPAs to provide the coverage by offering larger reimbursements. *See* 80 Fed. Reg. at 41323 n.22; 45 C.F.R. § 156.50(d).

[12] The government reimburses plan providers and TPAs for providing contraception benefits. Plan providers receive a downward adjustment to the user fees they must pay to the federal government to sell plans on the federally-facilitated health exchanges. The process for TPAs can be more complicated. If the TPA is not itself a participating insurer, then it must contract for contraceptive coverage with a participating insurer, and the insurer then passes on the reimbursement to the TPA. *See* 80 Fed. Reg. at 41328.

16

services." 45 C.F.R. § 147.131(c)(2)(ii). A plan provider or TPA also must notify plan participants and beneficiaries (contemporaneously with the delivery of other plan materials, if possible) "that the eligible organization does not administer or fund contraceptive benefits," but that the plan provider or TPA instead "provides separate payments for contraceptive services." 26 C.F.R. § 54.9815-2713A(d); 45 C.F.R. § 147.131(d).

## B.     The Parties and Procedural History

This opinion addresses two cases: one brought by EWTN and one brought by two Catholic Dioceses and a group of related persons and entities. Below, we briefly discuss the plaintiffs and the procedural history of each case in turn.

### 1.     Eternal Word Television Network

Plaintiff-appellant EWTN is a non-profit worldwide Catholic media network founded in 1981 by Mother Mary Angelica, a Catholic nun. EWTN, based in Irondale, Alabama, has approximately 350 employees. The network consists of 11 television feeds and two radio stations that reach 230 million homes in 144 countries and territories. Its programming includes daily Mass, Catholic devotions, coverage of Catholic Church events, documentaries, children's programs, educational series, and other television and radio shows that support EWTN's mission of "serv[ing] the orthodox belief and teaching of the Church as proclaimed by the Supreme Pontiff and his predecessors." Compl. at 5, No. 1:13-cv-00521-

17

CG-C, Doc. 1.  EWTN has a self-insured group health plan to provide health insurance benefits to its employees.  Blue Cross Blue Shield of Alabama serves as the TPA for the plan.

EWTN, together with the State of Alabama,[13] filed a complaint challenging the contraceptive mandate and accompanying regulations under RFRA, the First Amendment, the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.  The complaint alleged that "EWTN cannot facilitate access to health care insurance . . . that covers artificial contraception, sterilization, or abortion, or related education and counseling, without violating its deeply held religious beliefs."  Compl. at 7, No. 1:13-cv-00521-CG-C, Doc. 1.  To EWTN, this means that its religious beliefs prevent it both from providing contraceptive coverage in its health plan and from using the accommodation.  As a result, EWTN alleged, the contraceptive mandate "imposes government pressure and coercion on EWTN to change or violate its religious beliefs" because if it does not provide coverage or use the accommodation, it faces fines for non-compliance with the mandate.  *Id*. at 27.

EWTN and Alabama moved for partial summary judgment on five of the 17 counts in the complaint, including:  Count One, alleging a violation of RFRA

---

[13] Alabama was a party throughout the district court proceedings, but the State did not join EWTN in this appeal.

based on the regulations' burden on religious exercise; Count Two, alleging a violation of the Free Exercise Clause based on the same burden; Count Three, alleging a violation of the Free Exercise Clause based on intentional discrimination among religious organizations; Count Five, alleging a violation of the Establishment Clause based on the selective imposition of a burden on some religious organizations; and Count Nine, alleging a violation of the Free Speech Clause based on compelled speech. Alabama joined in EWTN's motion and additionally moved for summary judgment on Count Seventeen, which sought a declaration that the contraceptive mandate does not preempt Alabama law.

The defendants-appellees—the Departments and their Secretaries—filed a motion to dismiss the complaint or, in the alternative, for summary judgment on all of the plaintiffs' claims. The district court denied EWTN's and Alabama's motions for summary judgment and granted the defendants' motion for summary judgment as to Counts One, Two, Five, and Nine. On a motion by the plaintiffs, the district court entered a final judgment on those four counts pursuant to Federal Rule of Civil Procedure 54(b) and stayed litigation of the remaining claims pending appeal.

EWTN timely appealed. On EWTN's motion, we issued an injunction pending appeal, preventing the defendants from enforcing the mandate or the

19

accommodation against EWTN.  *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs.*, 756 F.3d 1339 (11th Cir. 2014).

### 2.    The Diocesan Plaintiffs, CENGI, and Catholic Charities

A group of Catholic entities—the Roman Catholic Archdiocese of Atlanta, the Archbishop of Atlanta, Christ the King Catholic School, Catholic Charities of the Archdiocese of Atlanta ("Catholic Charities"), the Roman Catholic Diocese of Savannah, and the Bishop of Savannah—filed a lawsuit against the Departments and their Secretaries.  Both the Archdiocese of Atlanta and the Diocese of Savannah (collectively with the Bishop and Archbishop, "the Dioceses") are associations of Catholic parishes and organizations, including Catholic schools. Catholic Charities is a nonprofit organization that provides social services, including immigration counseling, mental health counseling, marriage counseling, and pregnancy support services.  The second amended complaint added as a plaintiff Catholic Education of North Georgia ("CENGI") and removed Christ the King Catholic School.  CENGI is a nonprofit organization that oversees five Catholic schools in the Atlanta area.

The Atlanta Archdiocese operates a self-insured health plan, which covers employees of the Archdiocese, Catholic Charities, and CENGI.  The Savannah

Diocese operates two self-insured health plans for its employees.  Meritain Health serves as the TPA for all three plans.[14]

The second amended complaint alleged that the contraceptive mandate and accompanying regulations violate RFRA, the First Amendment, the non-delegation doctrine,[15] and the APA.  The plaintiffs alleged that the regulations require them "to provide, pay for, and/or facilitate insurance coverage for abortion-inducing drugs, sterilization, and contraception, in violation of their religious beliefs." Second Am. Compl. at 6, No. 1:12-cv-03489-WSD, Doc. 56.  They alleged that the regulations further burden religious exercise "by driving a wedge between religious organizations, like the Atlanta Archdiocese, and their equally religious charitable arms, such as Plaintiffs Catholic Charities and CENGI."  *Id*.  Because the charitable arms do not qualify as "religious employers," the Dioceses alleged

---

[14] The parties disagree over whether these health plans qualify as "church plans" for purposes of ERISA.  We need not decide whether the plans at issue are church plans because their ERISA status does not impact our conclusion that the accommodation does not substantially burden religious exercise.  If the plans are not church plans, then our analysis as to EWTN's self-insured plan applies, and the accommodation presents no burden on religious exercise.  *See infra* Part III.A.2.b.  If the plans are church plans, then the government lacks authority to enforce the contraceptive mandate against the plaintiffs' TPAs, rendering the plaintiffs' assertion that their actions trigger such coverage even weaker.  *See, e.g.*, *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1188 (10th Cir.) ("The lack of enforcement authority makes any burden on plaintiffs with church plans even less substantial than the burden on plaintiffs with self-insured plans that are subject to ERISA."), *cert. granted sub nom.*, *S. Nazarene Univ. v. Burwell*, 136 S. Ct. 445, *and cert. granted*, 136 S. Ct. 446 (2015).

[15] The non-delegation doctrine is the constitutional principle that prevents Congress from delegating its legislative authority to another body with "unfettered discretion to make whatever laws" the body sees fit.  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537-38 (1935).

21

they must expel the charities' employees from their health plans if the Dioceses wish to take advantage of the religious exemption.[16]

The Departments filed a motion to dismiss the second amended complaint or, alternatively, for summary judgment on all counts. The plaintiffs cross-moved for summary judgment as to seven of their eight counts, which alleged that the mandate and accompanying regulations: burden religious exercise in violation of RFRA (Count One); violate the Free Exercise Clause, based on the same burden (Count Two); compel speech in violation of the Free Speech Clause (Count Three); prohibit speech in violation of the Free Speech Clause (Count Four); favor certain religious groups and entangle the government in religion in violation of the Establishment Clause (Count Five); interfere with internal church governance in violation of both the Free Exercise and Establishment Clauses (Count Six); and involve an impermissible delegation of unchecked legislative authority to the Departments (Count Seven).

The district court granted summary judgment to Catholic Charities and CENGI on their RFRA claims, holding that the contraceptive mandate and accommodation substantially burden the organizations' religious exercise and are not the least restrictive means to accomplish a compelling governmental interest.

---

[16] We note that there is no dispute that EWTN, CENGI, and Catholic Charities qualify for the accommodation and not for the religious employer exemption.

22

The court enjoined the Departments from enforcing the mandate or the accommodation against Catholic Charities and CENGI. In addition, the court granted the plaintiffs' motion for summary judgment on their claim that the non-interference provision created a content-based speech restriction in violation of the First Amendment.

As to the Dioceses' RFRA claim, the court granted summary judgment to the Departments. The Dioceses had argued first that they might at some point have to pay more in premiums to help cover their plan providers' cost of contraceptive coverage, in violation of their religious beliefs, and second that the distinction between religious employers and organizations eligible for the accommodation would force the Dioceses to remove unaffiliated Catholic schools from their insurance plans. Rejecting both arguments, the district court ruled that the first argument was merely speculative (and the outcome on which the Dioceses speculated would, in any event, be prohibited by law) and the second argument failed to assert a legitimate religious exercise. The district court granted the Departments' summary judgment motion as to all of the plaintiffs' remaining claims based on the First Amendment, the non-delegation doctrine, and the APA.

Despite the split judgment, only the Departments appealed the district court's decision. Because revisions to the regulations have rendered the plaintiffs'

23

compelled speech claim based on the non-interference provision moot,[17] the appeal in this case concerns only the district court's grant of summary judgment to Catholic Charities and CENGI on their RFRA claim.

## II.    STANDARD OF REVIEW

"This court reviews the district court's disposition of cross-motions for summary judgment *de novo*, applying the same legal standards used by the district court, viewing the evidence and all factual inferences therefrom in the light most favorable to the non-movant, and resolving all reasonable doubts about the facts in favor of the non-moving party." *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005).  Summary judgment is proper if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted.  *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

---

[17] As noted above, in 2014 the Departments removed the regulations' requirement that organizations "must not, directly or indirectly, seek to influence the third party administrator's decision to" provide contraceptive coverage to the objecting organization's health plan participants and beneficiaries.  26 C.F.R. § 54.9815-2713A(b)(1)(iii) (2013); *see* 79 Fed. Reg. at 51095; *supra* note 9.

## III.    DISCUSSION

A.    **RFRA Claims**

1.    **Legal Background**

a.    **RFRA**

RFRA provides that the federal government "shall not substantially burden a person's exercise of religion" unless it demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)-(b).  Congress passed RFRA in 1993 in response to the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (characterizing *Smith*).  In *Smith*, the Supreme Court reasoned that "[t]o make an individual's obligation to obey [a neutral and generally applicable] law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling[,]' . . . contradicts both constitutional tradition and common sense." *Smith*, 494 U.S. at 885 (internal quotation marks and citation omitted).

25

Congress stated that the purpose of RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)."  42 U.S.C. § 2000bb(b)(1).  Congress declared the strict scrutiny standard provided "a workable test for striking sensible balances between religious liberty and competing prior governmental interests."  *Id.* § 2000bb(a)(5).  Indeed, RFRA "provide[s] even broader protection for religious liberty than was available under" *Sherbert* or *Yoder* because the government must also show that it used the least restrictive means to achieve its compelling interest. *Hobby Lobby*, 134 S. Ct. at 2761 n.3.

### b.    *Hobby Lobby*

In *Hobby Lobby*, the Supreme Court held that enforcing the contraceptive mandate without an accommodation against closely held for-profit corporations that objected on religious grounds to providing contraceptive coverage violated RFRA.  The corporations and their owners challenged the mandate as substantially burdening their religious exercise.  *Id.* at 2764-66.  The owners of the corporations sincerely believed that life begins at conception and that it is a sin to facilitate access to contraceptive drugs or devices that could destroy an embryo.  *Id.*  It was undisputed that the mandate required the plaintiffs to provide health insurance that covered methods of contraception that could result in the destruction of an embryo. *Id.* at 2775.  The plaintiffs asserted that the mandate left them with only two

26

options:  (1) provide coverage for contraception in violation of their religious beliefs or (2) pay significant penalties.  Given these choices, the Supreme Court held that the mandate "impose[d] a substantial burden."  *Id.* at 2779.

The government argued there was no substantial burden because the connection between what the mandate required the plaintiffs to do (provide health insurance that covered contraception) and the end that they found morally wrong (the destruction of an embryo) was too attenuated.  *Id.* at 2777.  The premise of the government's attenuation argument was that "providing the coverage would not itself result in the destruction of an embryo; that would occur only if an employee chose to take advantage of the coverage and to use one of the four [contraceptive] methods at issue."  *Id.*  In other words, the government asserted that the plaintiffs' belief—that providing insurance coverage for contraception facilitated the destruction of embryos—was unreasonable.  The Supreme Court rejected this argument, which would have required the Court to determine the "circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another."  *Id.* at 2778.  The Supreme Court cautioned that "federal courts have no business addressing" such questions of religion and moral philosophy.  *Id.*  Instead, the Supreme Court deferred to the plaintiffs' religious belief that the coverage "is

27

connected to the destruction of embryo in a way that is sufficient to make it immoral for them to provide the coverage." *Id.*

The Court then considered whether the mandate survived strict scrutiny. The majority assumed that the mandate furthered a compelling governmental interest[18] but held that it was not the least restrictive means of doing so. *Id.* at 2779-80. The Court pointed to the accommodation, which at the time applied only to nonprofit organizations with religious objections, as a less restrictive alternative.

---

[18] The majority opinion assumed without deciding that the government has a compelling interest. In separate opinions, five members of the Court appeared to go further, suggesting that a majority of the Court would agree that there is, in fact, a compelling interest.

The four dissenting justices concluded that the government carried its burden in showing that the mandate "furthers compelling interests in public health and women's well being." *Hobby Lobby*, 134 S. Ct. at 2799 (Ginsburg, J., dissenting). Justice Kennedy, who joined the majority, offered a separate concurrence in which he emphasized the importance of the majority's assumption that there is a compelling interest without explicitly stating that he agreed with that premise: "[it is] important to confirm that a premise of the Court's opinion is its assumption that the HHS regulation here at issue furthers a legitimate and compelling interest in the health of female employees." *Id.* at 2786 (Kennedy, J., concurring). He also reiterated the government's position that the mandate "provid[ed] insurance coverage that is necessary to protect the health of female employees, coverage that is significantly more costly than for a male employee." *Id.* at 2785-86.

Justice Ginsburg in her dissent and other courts have treated Justice Kennedy's concurrence as recognizing that the government has a compelling interest. *See id.* at 2800 n.23 (Ginsburg, J., dissenting) (writing that Justice Kennedy "recognize[d], without reservation," the existence of a compelling interest); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 624 (7th Cir. 2015) (Hamilton, J., concurring) ("Justice Kennedy's concurring opinion made clear that he viewed the governmental interests as compelling."); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 257 (D.C. Cir. 2014) (explaining why Justice Kennedy's concurrence was "more affirmative" than the majority opinion in recognizing a compelling interest), *cert. granted sub nom.*, *Roman Catholic Archbishop of Wash. v. Burwell*, 136 S. Ct. 444 (2015), *and cert. granted*, 136 S. Ct. 446 (2015). We are inclined to agree that Justice Kennedy's concurring opinion can be read as recognizing a compelling interest. Nonetheless, even if Justice Kennedy merely assumed (but did not decide) there is a compelling interest, such that a majority of the Supreme Court has not reached that conclusion, we conclude that there is a compelling interest here. *See infra* Part III.B.2.c.(i).

28

The Court explained that after an organization opts out, the plan provider (for insured plans) or TPA (for self-insured plans) must exclude contraceptive coverage from the group health plan and provide separate payments for contraceptive coverage without imposing cost sharing requirements on the organization, plan, or plan participants or beneficiaries. *Id.* at 2782. Although the Court declined to answer whether the accommodation complied with RFRA, it lauded the accommodation as "seek[ing] to respect the religious liberty of religious nonprofit corporations while ensuring that the employees of these entities have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage." *Id.* at 2759. The Court further recognized that "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero."[19] *Id.* at 2760.

### c.    *Wheaton College*

After *Hobby Lobby*, the Court considered the accommodation itself in the context of an injunction sought under RFRA in *Wheaton College*. The Court enjoined the government from enforcing the mandate but required the plaintiff to

---

[19] Justice Kennedy praised how the accommodation reconciled the competing priorities of ensuring that "no person may be restricted or demeaned by government in exercising his or her religion" and that the same exercise does not "unduly restrict other persons . . . in protecting their own interests, interests the law deems compelling." *Hobby Lobby*, 134 S. Ct. at 2786-87 (Kennedy, J., concurring).

inform HHS in writing that it had religious objections to providing coverage for contraceptive services.  134 S. Ct. at 2807.  The Court explained that the government could "rely[] on this notice . . . to facilitate the provision of full contraceptive coverage."  *Id.*  The practical effect of the *Wheaton College* decision was twofold: the plaintiff received an accommodation, and HHS could rely on the notification to provide contraceptive coverage to the participants and beneficiaries of the plaintiff's plan.

### d.    Other RFRA Challenges to the Accommodation

After *Hobby Lobby* and *Wheaton College*, federal courts around the country considered RFRA challenges to the accommodation.  Applying these two Supreme Court decisions, seven of the eight circuits to review these cases held that the accommodation does not violate RFRA.  *See Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir.), *cert. granted sub nom.*, *S. Nazarene Univ. v. Burwell*, 136 S. Ct. 445, *and cert. granted*, 136 S. Ct. 446 (2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir.), *cert. granted*, 136 S. Ct. 444 (2015); *Univ. of Notre Dame v. Burwell* ("*Notre Dame II*"), 786 F.3d 606 (7th Cir.

2015);[20] *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir.), *cert. granted sub nom.*, *Zubik v. Burwell*, 136 S. Ct. 444, *and cert. granted*, 136 S. Ct. 445 (2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.* ("*Priests for Life I*"), 772 F.3d 229 (D.C. Cir. 2014), *reh'g en banc denied*, ("*Priests for Life II*"), 808 F.3d 1 (D.C. Cir. 2015), *cert. granted sub nom.*, *Roman Catholic Archbishop of Wash. v. Burwell*, 136 S. Ct. 444 (2015), *and cert. granted*, 136 S. Ct. 446 (2015).  These circuits concluded that the accommodation does not substantially burden religious exercise.[21]  The Eighth Circuit disagreed, holding that the accommodation substantially burdens religious exercise and cannot survive strict scrutiny.  *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, 801 F.3d 927 (8th Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3350 (U.S. Dec. 15, 2015) (No. 15-775).  Recently, the Supreme Court granted certiorari in several of these cases.

The seven circuits that upheld the accommodation recognized that the RFRA claim in *Hobby Lobby* was fundamentally different from challenges to the

[20] Before *Hobby Lobby* was decided, the Seventh Circuit affirmed the denial of a preliminary injunction to enjoin the enforcement of the mandate and accommodation in *University of Notre Dame v. Sebelius* ("*Notre Dame I*"), 743 F.3d 547 (7th Cir. 2014). Subsequently, the Supreme Court granted certiorari, vacated the Seventh Circuit's judgment in *Notre Dame I*, and remanded for consideration in light of *Hobby Lobby*. *Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015). After considering *Hobby Lobby*, the Seventh Circuit issued *Notre Dame II* again affirming the denial of a preliminary injunction.

[21] Two circuits have held, in the alternative, that even assuming the accommodation imposes a substantial burden, it survives strict scrutiny under RFRA. *See Notre Dame II*, 786 F.3d at 616-17; *Priests for Life I*, 772 F.3d at 256-57.

31

accommodation itself.  In *Hobby Lobby*, the plaintiffs challenged the mandate—

that is, the requirement that they provide contraceptive coverage—when their only

options were to provide the coverage or pay significant penalties.  But in the

accommodation cases, the plaintiffs have challenged the regulatory scheme that

allows them to opt out of the mandate without penalty.  Put another way, the

plaintiffs in the accommodation cases "do not challenge the general obligation

under the ACA to provide contraceptive coverage.  They instead challenge the

process they must follow to get out of complying with that obligation."  *Little*

*Sisters of the Poor*, 794 F.3d at 1160.  Because they assert that "the exemption

process itself imposes a substantial burden on their religious faiths," their

challenges are somewhat "paradoxical and virtually unprecedented."  *Priests for*

*Life I*, 772 F.3d at 246 (internal quotation marks omitted).

     The circuits upholding the accommodation recognized that the question of

whether there is a substantial burden involves an objective inquiry.  After

interpreting the ACA and its regulations, they held that the act of opting out does

not trigger contraceptive coverage.  *See, e.g., Notre Dame II*, 786 F.3d at 614

(explaining that "[i]t is federal law, rather than the religious organization's signing

and mailing the form, that requires . . . third-party administrators of self-insured

health plans[] to cover contraceptive services").  Although the eligible

organizations asserted that the act of opting out makes them complicit in providing

coverage, these courts explained that this objection could not constitute a substantial burden because individuals "have no RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors." *Priests for Life I*, 772 F.3d at 246.

In *Sharpe Holdings*, the Eighth Circuit reached the opposite conclusion, holding that the accommodation substantially burdened religious exercise, and enjoined the government from enforcing the accommodation. Relying on *Hobby Lobby*, the Eighth Circuit held that it was bound to accept the plaintiffs' "assertion that self-certification under the accommodation process—using either Form 700 or HHS Notice—would violate their sincerely held religious beliefs."[22] *Sharpe Holdings*, 801 F.3d at 941. Because the plaintiffs faced a substantial penalty if they failed to seek an accommodation or provide contraceptive coverage, the Eighth Circuit concluded there was a substantial burden. *Id.* at 942.

The Eighth Circuit then applied strict scrutiny. The court assumed that the government had a compelling interest but held that the government had failed to carry its burden to show that it lacked other means to achieve its interest without imposing a substantial burden on religion. *Id.* at 943. The Eighth Circuit

---

[22] Although the Eighth Circuit deferred to the plaintiffs' understanding of how the accommodation functioned, it agreed that the act of opting out triggered coverage. *See Sharpe Holdings*, 801 F.3d at 942 (TPAs have no "wholly independent obligation" to provide contraceptive coverage).

concluded that less restrictive alternatives included the government: (1) requiring less information from eligible organizations seeking an accommodation; (2) assuming the cost of providing contraceptives through subsidies, reimbursements, tax credits, or tax deductions to employees; (3) paying for distribution of contraceptives at community health centers, public clinics, and hospitals; or (4) making contraceptive coverage available through the healthcare exchanges. *Id.* at 944-45. Given these alternatives, the Eighth Circuit concluded that the accommodation failed to survive strict scrutiny.

### 2. RFRA Analysis

With this legal landscape in mind, we now consider the plaintiffs' RFRA challenge. We hold that their challenge fails because (1) the accommodation does not substantially burden their religious exercise, and (2) in the alternative, even if there is a substantial burden, the accommodation survives strict scrutiny.

### a. The Plaintiffs Allege a Sincere Religious Belief.

A threshold question we must ask is whether the plaintiffs' religious beliefs on which their RFRA claims are based are sincere. *See Hobby Lobby*, 134 S. Ct. at 2774 n.28 ("To qualify for RFRA's protection, an asserted belief must be 'sincere'. . . ."). It is well established that we defer to a plaintiff's statement of its own belief, so long as the plaintiff actually holds that belief. *See id.* at 2779 ("[I]t is not for [courts] to say that [the plaintiffs'] religious beliefs are mistaken or

insubstantial."); *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir.) ("[W]e look only to see whether the claimant . . . actually holds the beliefs he claims to hold." (internal quotation marks omitted)), *cert. denied sub nom.*, *Davila v. Hayes*, 136 S. Ct. 78 (2015).

Each plaintiff states that its religious beliefs prevent it from paying for, providing, or facilitating the distribution of contraceptives. Each plaintiff also asserts that it cannot be complicit in the provision of contraception. The government does not contest the sincerity of these religious beliefs, nor is there any indication whatsoever in the record that the stated beliefs are insincere. We thus conclude that the plaintiffs' religious beliefs at issue are sincere.

### b.    The Accommodation Does Not Substantially Burden the Plaintiffs' Religious Exercise.

We now consider whether, accepting the plaintiffs' sincere religious beliefs, the accommodation substantially burdens their religious exercise. The plaintiffs assert that the act of notifying HHS or their TPAs of their religious objection will either trigger contraceptive coverage or make them complicit in a system that provides such coverage. Due to the significance they attach to opting out, the plaintiffs contend that the accommodation itself imposes a substantial burden because it puts them to the choice of violating their sincerely held religious beliefs or paying a substantial penalty. We accept the plaintiffs' sincere belief that triggering coverage or being complicit in coverage violates their religious beliefs

35

and that the accommodation puts them to a choice between honoring their religious beliefs and facing significant penalties.  We nonetheless conclude that the accommodation imposes no substantial burden.

### (i)    The Substantial Burden Analysis Involves an Objective Inquiry.

"[A] 'substantial burden' must place more than an inconvenience on religious exercise."  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).[23]  A law is substantially burdensome when it places "significant pressure" on an adherent to act contrary to her religious beliefs, meaning that it "directly coerces the religious adherent to conform . . . her behavior."  *Id*.  Thus, the government imposes a substantial burden when it places "pressure that tends to force adherents to forego religious precepts."  *Id.*

This inquiry involves both subjective and objective dimensions.  *Hobby Lobby* made clear that there is a subjective aspect to this inquiry: courts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action.  *See* 134 S. Ct. at 2779.  But the

---

[23] *Midrash* concerned the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which Congress enacted after the Supreme Court struck down RFRA as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507 (1997).  RLUIPA imposes the same requirement as RFRA—that the government refrain from substantially burdening religious exercise unless the burden is the least restrictive means of achieving a compelling government interest—on programs and activities that receive federal funding.  42 U.S.C. § 2000cc-1.  We apply the same substantial burden analysis under both RLUIPA and RFRA.  *See generally Davila*, 777 F.3d at 1204; *Midrash*, 366 F.3d at 1237.

substantial burden analysis does not end there. We agree with our seven sister circuits that the question of substantial burden also presents "a question of law for courts to decide." *Priests for Life I*, 772 F.3d at 247.

The objective inquiry requires courts to consider whether the government actually "puts" the religious adherent to the "choice" of incurring a "serious" penalty or "engag[ing] in conduct that seriously violates [his] religious beliefs." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (second alteration in original and internal quotation marks omitted). Put another way, courts must determine what the challenged law actually requires of the plaintiff. For example, in *Holt*, a Muslim inmate asserted that prison grooming policy substantially burdened his religious exercise because it prohibited him from growing a beard, which his religion required. The Supreme Court explained that because the "grooming policy requires petitioner to shave his beard," the policy "put[]" him to the choice of violating his religious beliefs or facing serious disciplinary action. *Id.* In *Holt*, as in many RFRA cases, this inquiry was straightforward because there was no dispute about what the government's policy objectively required of the religious adherent. But when there is a dispute about what a law or governmental policy objectively requires, it is for the courts to construe the law or policy.

The plaintiffs here contend that under *Hobby Lobby* no such objective inquiry is required. In their view, a religious adherent's mere assertion that she is

37

being compelled to violate her sincerely held religious belief means that the

government has put her to such a choice, regardless of what the law objectively

requires.[24]  We disagree.  In *Hobby Lobby*, the plaintiffs challenged the

contraceptive mandate.  It was undisputed that the mandate gave the plaintiffs just

two options:  provide contraceptive coverage or pay a substantial penalty.

Although the Supreme Court engaged in no objective analysis about what the

mandate required, such analysis was unnecessary because the parties agreed that

the government, through the mandate, put the plaintiffs to the choice of providing

contraceptive coverage or paying a hefty fine.  *See Hobby Lobby*, 134 S. Ct. at

2777-79; *see also Priests for Life II*, 808 F.3d at 2 (Pillard, J.) (concurring in denial

of reh'g en banc) ("The parties in *Hobby Lobby* did not dispute what the law

required, nor its practical effects . . . .").

Here, the parties agree that the plaintiffs have at least three options:  provide

contraceptive coverage, pay a penalty, or use the accommodation to opt out of

providing contraceptive coverage.[25]  But they disagree about whether opting out

---

[24] The Eighth Circuit similarly interpreted *Hobby Lobby* as requiring courts to "accept [the plaintiffs'] assertion that self-certification under the accommodation process . . . would violate their sincerely held religious beliefs."  *Sharpe Holdings*, 801 F.3d at 941.

[25] We agree with the dissent that the plaintiffs have a fourth option, as well: to terminate their TPAs and take over the costs and responsibilities of running their self-insured plans.  *See* Dissent at 109-10.  But, the Departments contend there is no evidence of the existence of any self-insured plan without a TPA.  *See* 78 Fed. Reg. at 39880 ("[T]he Departments continue to believe that there are no self-insured group health plans in this circumstance.").  If an eligible organization elected to become the first self-insured plan without a TPA, it would enjoy at least a

puts the plaintiffs to the choice of violating their religious beliefs or paying a substantial fine.  The plaintiffs contend that because an eligible organization's TPA only becomes obligated to provide coverage when the organization opts out, by opting out they will be triggering coverage.  The government argues to the contrary that plan participants and beneficiaries are entitled to contraceptive coverage under the ACA regardless of any opt out.  We conclude that it is for the courts to determine objectively what the regulations require and whether the government has, in fact, put plaintiffs to the choice of violating their religious beliefs by seeking the accommodation or incurring a substantial penalty.

We reject a framework that takes away from courts the responsibility to decide what action the government requires and leaves that answer entirely to the religious adherent.  Such a framework improperly substitutes religious belief for legal analysis regarding the operation of federal law.  Indeed, the plaintiffs have identified nothing in RFRA or case law that allows a religious adherent to dictate to the courts what the law requires.  The plain language of RFRA simply does not support reducing the role of federal courts to "rubber stamps" that automatically

temporary safe harbor so long as the plan notifies (1) HHS that it has no TPA and (2) plan participants and beneficiaries that the plan provides no benefits for contraceptive services. *Id.*

We assume for purposes of this appeal that if the government forced an eligible organization to have a self-insured plan without a TPA, it would be imposing a substantial burden.  Nonetheless, we conclude there is no substantial burden because eligible organizations can instead select the accommodation.

recognize a substantial burden whenever a religious adherent asserts there is one. *Catholic Health Care Sys.*, 796 F.3d at 218.  If Congress had intended strict scrutiny to be triggered in all circumstances by a religious adherent's claim that there is a burden, it would have said so.  Instead, it required that the federal government "substantially burden" the adherent's religious exercise.

Our dissenting colleague concedes that the question of substantial burden involves an objective inquiry but asserts that the inquiry should be limited to whether the government has imposed a substantial penalty.  *See* Dissent at 113-15. This analysis would require courts to defer to a religious adherent's sincere belief that the government is forcing her to choose between her religious belief and paying a substantial fine, even when the religious adherent is objectively wrong about how the law operates and what action the government requires her to take. The dissent's view is flawed because any burden (even an objectively insubstantial one) becomes a substantial burden if the penalty is heavy enough.

We acknowledge that in *Hobby Lobby* the Supreme Court cautioned courts against dictating to religious adherents "the circumstances under which it is immoral for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." 134 S. Ct. at 2778.  In some cases, a court's objective analysis interpreting a statute or regulation may contradict a religious adherent's sincerely held belief about what

40

that law requires. But such questions about what a law means are not the type of "difficult and important question of religion and moral philosophy" for which courts must defer to religious adherents. *Id.*; *see Notre Dame II*, 786 F.3d at 623 (Hamilton, J., concurring) (explaining that the interpretation of the regulations that give rise to the accommodation "is an issue not of moral philosophy but of federal law").

Deciding how the law functions is not the only objective part of the substantial burden inquiry. The Supreme Court's free exercise cases (prior to *Smith*) distinguished between *substantial* burdens on religious exercise, which are protected, and de minimis burdens, which are not. For example, a religious adherent may not "require the Government to conduct its own internal affairs in ways that comport" with the person's religious beliefs, even if the government action interferes with that person's religious exercise. *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986); *see Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (recognizing that government's decision to log and build roads would "have severe adverse effects" on practice of Native American religion but concluding this burden was not "heavy enough" to trigger strict scrutiny under the Free Exercise Clause).

In *Bowen*, Native American parents challenged federal statutes requiring them to provide their daughter's social security number to state welfare agencies as

41

a condition of seeking benefits on the ground that it impinged upon their free exercise of religion. They sought an accommodation to keep the government from using her social security number in administering benefits, which they believed would rob their daughter of her spirit. 476 U.S. at 695-96.

Even recognizing that the parents had a sincere belief that by using her social security number the government would be stealing their daughter's spirit, the Supreme Court rejected their claim, holding that the government's "use of a Social Security number . . . does not itself in any degree impair [the parents'] freedom to believe, express, and exerc[ise their] religion.'" *Id.* at 700 (internal quotation marks omitted). The Court rejected the parents' attempt to use the Free Exercise Clause to "demand that the Government join in their chosen religious practices." *Id.* at 699-700. The Court explained that "[t]he Free Exercise Clause affords an individual protection from certain forms of governmental compulsion," yet does not extend so far to "afford an individual a right to dictate the conduct of the Government's internal procedures." *Id.* at 700. The Court acknowledged that the parents' "religious views may not accept" the line that the Court drew "between individual and governmental conduct," but it drew a line nonetheless.

42

*Id.* at 701 n.6.  Likewise, under RFRA courts must determine whether the burden on a religious adherent is, in fact, substantial.[26]

As we alluded to above, the plain language of RFRA supports our conclusion that there is a distinction between a burden and a substantial burden. RFRA requires strict scrutiny only when the government "substantially burden[s] a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  Congress chose to modify "burden" with "substantial[],"[27] and we must of course interpret RFRA to give full effect to its every word.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (recognizing that statutes should be construed whenever possible so that "no clause, sentence, or word shall be superfluous, void, or insignificant" (internal quotation marks omitted)).

---

[26] We reiterate that in *Hobby Lobby* the Supreme Court did not grapple with this aspect of the substantial burden analysis.  But it was plain that the action required of the plaintiffs in that case—paying to provide health insurance that included contraceptive coverage—imposed a substantial burden.  Accordingly, the Court had no occasion to address the more difficult question presented here, where the plaintiffs' claims of substantial burden rest on their assertion that seeking an accommodation results in another entity (the TPA) providing contraceptive coverage and thus makes them complicit in a system that achieves an end to which they have a religious objection.  In other words, *Hobby Lobby* did not pose the issue whether courts must defer to a religious adherent's assertion that seeking an accommodation (opting out) itself imposes a substantial burden.

[27] Congress used "substantial burden" instead of "burden" in order "to clarify [that] the compelling interest required by the Religious Freedom [Restoration] Act applies only where there is a substantial burden placed on the individual free exercise of religion."  139 Cong. Rec. S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch) (emphasis added).  Limiting RFRA's application to substantial burdens was intended to ensure that the government was not required "to justify every action that has some effect on religious exercise."  *Id.*

43

We recognize that the distinction between burden and substantial burden is not implicated in every RFRA case. Nonetheless, there are cases brought under RFRA in which the purported burden is too slight to trigger strict scrutiny. For example, in *Kaemmerling v. Lappin*, an inmate challenged under RFRA the Bureau of Prison's collection and analysis of his DNA. 553 F.3d 669, 673-74 (D.C. Cir. 2008). He claimed that the government's sampling, collection, and analysis of his DNA violated his sincerely held religious beliefs about the proper use of DNA. The D.C. Circuit concluded there was no substantial burden. Importantly, the inmate had no religious objection to the collection of his bodily material; he challenged only how the government would subsequently use that specimen to extract his DNA information. *Id.* at 678-79. There was no question that the Bureau of Prisons required the inmate to submit a bodily specimen that would be used for an end to which he had a strong religious objection (that is, the collection and analysis of his DNA). But the D.C. Circuit held there was no substantial burden because the inmate "suggest[ed] no way in which these government acts pressure[d] him to modify his own behavior in any way that would violate his beliefs." *Id.* at 679. *Kaemmerling* reinforces that a religious adherent cannot use RFRA to stop the government or third parties from taking subsequent actions to which he objects when the acts required of him impose a de minimis burden.[28]

---

[28] Our dissenting colleague worries that our framework creates a "Bizarro World" in

### (ii)    No Substantial Burden Exists.

To determine whether the accommodation objectively puts plaintiffs to the choice of violating their religious beliefs or paying a significant fine, we must understand how the accommodation functions and what it requires of these plaintiffs. The only act that the regulations require the plaintiffs to take is to seek the accommodation—that is, filling out and sending Form 700 to their TPAs or writing a letter to HHS letting it know of their objections. The plaintiffs do not contend that notifying HHS or their TPAs itself constitutes a substantial burden because of the time or effort involved. Rather, their objection is based on the significance they attribute to this act. They contend that the act of opting out triggers contraceptive coverage for plan participants and beneficiaries or makes them complicit in a system that provides contraceptive coverage. We accept that the plaintiffs truly believe that triggering contraceptive coverage or being complicit in a system providing contraceptive coverage violates their religious beliefs. But

which courts determine whether the burden imposed by a law or regulation violates the adherent's beliefs. Dissent at 117-18. The dissent overstates our position. We are not saying that courts may determine that when a prison requires a Muslim inmate to shave his beard or the government forces a Seventh-Day Adventist to work on the Sabbath, the religious adherent's claim that the government is coercing him to forego his religious precepts is wrong. But when a dispute exists about whether the challenged governmental policy actually requires an inmate to shave his beard or a person to work on Saturday, it is for the courts to determine what the law requires. *See, e.g., Sherbert*, 374 U.S. at 403-04 (Supreme Court performed its own analysis to determine whether challenged policy compelled Seventh-Day Adventist to work on Saturdays). Likewise, when a religious adherent challenges an accommodation scheme as imposing a substantial burden on the religious adherent based on subsequent actions taken by the government or third parties, it is for the courts to determine whether the burden is substantial.

45

our objective inquiry leads us to conclude that the government has not put plaintiffs to the choice of violating their religious beliefs or facing a significant penalty.  We hold there is no substantial burden.

Here's why:  the ACA and HRSA guidelines are what entitle plan participants and beneficiaries to contraceptive coverage.  The ACA provides that the plaintiffs' self-insured plans "shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventative care and screenings . . . as provided for in" the HRSA guidelines.  42 U.S.C. § 300gg-13(a)(4).  The HRSA Guidelines, in turn, "require coverage, without cost sharing, for '[a]ll . . . [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity.'"  77 Fed. Reg. at 8725 (alterations in original) (quoting HRSA guidelines).

The plaintiffs and the dissent take a different view of the statutory and regulatory scheme, contending that an eligible organization's act of opting out triggers the TPA's designation as plan administrator and, without it, plan participants or beneficiaries would not receive contraceptive coverage.[29]  Indeed,

---

[29] Because the plaintiffs here have only self-insured plans, we consider only the accommodation procedures that apply to self-insured health plans.

For an eligible organization with a plan insured by a third party, the accommodation imposes no new coverage obligation.  The eligible organization's act of opting out simply makes

the dissent asserts that opting out requires an eligible organization's "affirmative participation" because the act of opting out is the "linchpin on which the contraceptive mandate rests." Dissent at 125. We disagree.

The ACA and the HRSA guidelines—not the opt out—are, to borrow the dissent's term, the "linchpins" of the contraceptive mandate because they entitle women who are plan participants and beneficiaries covered by group health insurance plans to contraceptive coverage without cost sharing. In other words, women are entitled to contraceptive coverage regardless of their employers' action (or lack of action) with respect to seeking an accommodation. Because a woman's entitlement to contraceptive benefits does not turn on whether her eligible organization employer chooses to comply with the law (by providing contraceptive coverage or seeking an accommodation) or pay a substantial penalty (in the form of a tax) for noncompliance, we cannot say that the act of opting out imposes a substantial burden.[30]

_____

the coverage the plan provider's "*sole* responsibility rather than one shared with the group health plan itself." *Little Sisters of the Poor*, 794 F.3d at 1181.

[30] The dissent complains that our reading renders the act of opting out "meaningless." Dissent at 128 (internal quotation marks omitted). The dissent misses our point. Although plan participants and beneficiaries are entitled to contraceptive coverage under federal law regardless of any opt out, notification of the opt out allows the government to identify the plan participants and beneficiaries who will not receive contraceptive coverage from a self-insured eligible organization because of that organization's religious objection to the mandate. In other words, the act of opting out aids the government in identifying these women and making sure that they receive the contraceptive coverage to which they are legally entitled. Thus, the act of opting out

47

We do not mean to imply that the act of opting out plays no causal role in the ultimate provision of contraceptive coverage. We acknowledge that an eligible organization's act of notifying HHS or its TPA of its objection results in the TPA's designation as the plan administrator and gives rise to the TPA's obligation to provide contraceptive coverage.[31] *See* 29 C.F.R. § 2510.3-16(b). But we view an eligible organization's act of opting out as, at most, an incidental cause of plan participants and beneficiaries receiving contraceptive coverage because these women are entitled to contraceptive coverage under the ACA and HRSA guidelines regardless of whether the eligible organization opts out. Accordingly, even if the act of opting out in some way leads to women receiving the contraceptive coverage to which they were entitled under federal law, the plaintiffs have failed to establish that the act of opting out substantially burdens their religious exercise. Importantly, the government does not force an eligible organization to provide contraceptive coverage, pay costs related to contraceptive coverage, notify plan participants and beneficiaries of the existence of such coverage, or even include the availability of such coverage from a separate source in information the plan provides to plan participants and beneficiaries. Instead, all

has significance in the regulatory scheme, but not because it creates a woman's entitlement to contraceptive coverage.

[31] Indeed, the government has admitted that an eligible organization's opt out results in a TPA's designation as plan administrator and the TPA providing plan participants and beneficiaries contraceptive benefits.

of these responsibilities fall upon the TPA. Rather, the only action required of the eligible organization is opting out: literally, the organization's notification of its objection. Such an opt out requirement is "typical of religious objection accommodations that shift responsibility to non-objecting entities only after an objector declines to perform a task on religious grounds." *Little Sisters of the Poor*, 794 F.3d at 1183.

The plaintiffs' challenge is in substance indistinguishable from an objection to the government's requiring another entity to provide coverage in their stead. *See Catholic Health Care Sys.*, 796 F.3d at 224 (characterizing an identical challenge as seeking a "blanket religious veto over the government's interactions with others"). Put differently, the plaintiffs' opposition to opting out is an objection to their inability to keep the TPA with which they have contracted to provide services in connection with healthcare coverage from complying with the relevant regulations. The plaintiffs point to a but-for causal relationship between their opting out and the conduct that they find religiously objectionable. But, as the Supreme Court has explained, a religious adherent cannot claim a substantial burden based on the subsequent conduct of another party.[32] *See Bowen*, 476 U.S.

---

[32] The plaintiffs argue that under the accommodation they are facilitating access to contraceptives because their ongoing contractual relationship with their TPA leads the TPA to continue to provide contraceptive coverage to plan participants and beneficiaries. It is true that a TPA remains as plan administrator for purposes of contraceptive coverage only so long as the organization serves as the plan's TPA. Nonetheless, the plaintiffs cannot show a substantial

49

at 699-700 ("Just as the government may not insist that appellees engage in any set form of religious observance, so appellees may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter.").[33]

We recognize that the plaintiffs sincerely abhor and object to the subsequent acts taken by the government and their TPA, which ultimately result in the TPA providing contraceptive coverage to their plan participants and beneficiaries. We acknowledge that they "may not accept [the] distinction" that we draw here between their conduct and the downstream, separate conduct of HHS and the TPAs to provide coverage. *Id.* at 701 n.6. But we simply cannot say that RFRA affords the plaintiffs the right to prevent women from obtaining contraceptive coverage to which federal law entitles them based on the de minimis burden that the plaintiffs face in notifying the government that they have a religious objection.

As the Seventh Circuit first articulated, an analogy to a conscientious objector to the military draft illustrates why the accommodation does not impose a

_____

burden because, as explained above, their challenge is an objection to the TPA's subsequent conduct.

[33] The dissent dismisses *Bowen* as distinguishable because the plaintiffs here object only to their own participation in the accommodation, not to any acts taken by the government. *See* Dissent at 126-27 n.32. We are not persuaded. The dissent's position ignores that the plaintiffs object to opting out because it requires them to play a causal role (albeit, a small one) in a system in which the government requires contraceptive coverage. Put another way, their religious objection is, at its core, an objection to the government requiring the TPAs to provide coverage upon their opting out.

substantial burden.  *See Notre Dame I*, 743 F.3d at 556.  A religious conscientious objector to the military draft may opt of military service based on his belief that war is immoral.  The objector sincerely believes that his act of opting out triggers the drafting of another person in his place, and thus renders him complicit in the very thing to which he objects.  But we would reject the assertion that the government's subsequent act of drafting another person in his place—even though the drafting was in some sense caused by the objector's act of opting out—transforms the act of lodging a conscientious objection into a substantial burden.  *See id.*  Likewise, we reject the plaintiffs' assertion that opting out imposes a substantial burden because the government requires a third party to provide contraceptive coverage after an eligible organization opts out.

Accordingly, we conclude that through the accommodation the government has imposed no substantial burden on the plaintiffs.  We thus hold that the accommodation does not violate RFRA.

### c.    The Accommodation Survives Strict Scrutiny.

Even assuming that the accommodation imposes a substantial burden on plaintiffs' religious exercise, RFRA allows the government to impose such a burden when it demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  Because the

government has carried its burden of showing that the accommodation is the least restrictive means of furthering its compelling interests, we hold in the alternative that the accommodation survives strict scrutiny under RFRA.

### (i)     Compelling Interests Justify the Accommodation.

In applying RFRA's strict scrutiny test, we must first determine whether the accommodation is "in furtherance of a compelling governmental interest." *Id.* Because the mandate and accommodation require the provision of cost-free contraceptive coverage with little to no administrative burden on women, these regulations further compelling government interests in avoiding the adverse public health consequences of unintended pregnancies and in assuring women the equal benefit of preventative care by requiring coverage for their distinctive health needs.[34] *See Priests for Life I*, 772 F.3d at 258-59.

---

[34] As we explained above, the majority in *Hobby Lobby* assumed without deciding that there was a compelling governmental interest. There is, however, an argument that five justices concluded there was a compelling interest. *See supra* note 18. But even if Justice Kennedy's concurring opinion in *Hobby Lobby* did not recognize a compelling governmental interest, we would hold that the compelling interest test is satisfied here.

We acknowledge that the majority opinion in *Hobby Lobby* criticized the government's purported interests in "promoting public health and gender equality" as "broadly framed." 134 S. Ct. at 2779 (internal quotation marks omitted). But we agree with the D.C. Circuit that the government has now provided a more focused analysis "by explaining how those larger interests inform and are specifically implicated in its decision to support women's unhindered access to contraceptive coverage." *Priests for Life I*, 772 F.3d at 259.

### (a)    The Government's Interests in Reducing the Rate of Unintended Pregnancies Are Compelling.

We begin our analysis with the facts:  unintended or poorly spaced pregnancies have a host of negative impacts on women and children.  *See supra* Part I.A.  Women who experience unintended pregnancies are often unaware of their condition in the early stages of their pregnancy, which leads them to delay prenatal care and cessation of behaviors such as smoking or alcohol consumption. 78 Fed. Reg. at 39872.  Babies born as a result of unintended pregnancies are at a greater risk of premature birth and low birth weight.  *Id.*  Short interpregnancy intervals also result in a greater risk of prematurity and low birth weight.  *Id.* Contraceptive use can alleviate these public health problems.[35]  "[G]reater use of contraception within the population produces lower unintended pregnancy and abortion rates nationally."  IOM Report at 105.

During debate over the ACA, Congress was informed that "[i]n America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access."  155 Cong. Rec. S12027 (Dec. 1, 2009) (statement of Sen. Gillibrand).  The IOM Report also found that "cost-sharing

---

[35] Many contraceptives also carry significant positive health side effects.  "[T]he non-contraceptive benefits of hormonal contraception include treatment of menstrual disorders, acne or hirsutism, and pelvic pain.  Long-term use of oral contraceptives has been shown to reduce a woman's risk of endometrial cancer, as well as protect against pelvic inflammatory disease and some benign breast diseases."  IOM Report at 107 (internal citations omitted).

requirements, such as deductibles and copayments, can pose barriers to care and result in reduced use of preventive and primary care services, particularly for low-income populations." IOM Report at 109. The Women's Health Amendment, which added to the ACA the requirement that group and individual health plans provide women with coverage for preventative care and screenings, aimed to increase women's use of preventive care by removing administrative and financial barriers. *See* 155 Cong. Rec. S12027 (statement of Sen. Shaheen) ("Too often, women forgo their health care needs because they are not affordable. We know cost plays a greater role in preventing women from accessing health care than it does men. In 2007, more than half of all women reported problems accessing needed health care because of costs."); *see also Priests for Life I*, 772 F.3d at 260 (explaining that Congress and the Executive branch determined with the ACA and its regulations that "serving the government's compelling public health interests depends on overcoming the human behavioral tendencies of denial and delay documented in the legislative and regulatory record").

Moreover, the Women's Health Amendment, which added the contraceptive mandate to the ACA's minimum coverage requirements, specifically addressed the need to provide preventive care to women to rectify past gender discrimination in health insurance. As the Departments noted, "the statute acknowledges that both existing health coverage and existing preventive services recommendations often

54

did not adequately serve the unique health needs of women. This disparity placed women in the workforce at a disadvantage compared to their male coworkers."[36] 78 Fed. Reg. at 39873; *see also* 155 Cong. Rec. S12027 (statement of Sen. Gillibrand) ("The prevention section of the bill before us must be amended so coverage of preventive services takes into account the unique health care needs of women throughout their lifespan."). Indeed, before the ACA, "women of childbearing age spent 68 percent more on out-of-pocket health care costs than men." 78 Fed. Reg. at 39887. The Departments explained that this "disproportionate" financial burden "prevented women from achieving health outcomes on an equal basis with men." *Id.* The Departments intended the contraceptive coverage requirement to "help[] to equalize the provision of preventative health care services to women and, as a result, help[] women contribute to society to the same degree as men." *Id.* As the Departments explained, "[r]esearch shows that access to contraception improves the social and economic status of women." *Id.* at 39873; *see generally* Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives & Women's Career & Marriage Decisions*, 110 J. of Pol. Econ. 731 (2002).

---

[36] *See also* 155 Cong. Rec. S11987 (statement of Sen. Mikulski) ("Women are often faced with the punitive practices of insurance companies. No. 1 is gender discrimination. Women often pay more and get less. For many insurance companies, simply being a woman is a preexisting condition. . . . We pay more because of our gender, anywhere from 2 percent to over 100 percent.").

Based on this evidence, we conclude that the government's interests in the public health of women and children, as well as in assuring women equal preventative care, are compelling.

### (b)    The Mandate and Accommodation Further These Compelling Interests.

The mandate and accommodation achieve the government's goals by making contraceptives affordable and otherwise accessible to women. As explained above, federal law generally guarantees women contraceptive coverage without cost sharing. *See* 42 U.S.C. § 300gg-13(a)(4); 77 Fed. Reg. at 8725 (discussing HRSA guidelines). Importantly, under the mandate and accommodation, women covered by group health insurance plans generally are required to take no additional action to obtain this contraceptive coverage. This is because the coverage is delivered "through the existing employer-based system of health coverage." 78 Fed. Reg. at 39888. Thus, under the mandate, women need not complete extra paperwork or sign up for an additional program because the contraceptive coverage is delivered with the health insurance they already have through their employers.

This is true even when an employer opts out of providing contraceptive coverage by seeking an accommodation. Although objecting employers are not obligated to provide or pay for contraceptives, the women covered by their plans seamlessly receive contraceptive coverage from the plans' TPAs. This system was

56

carefully designed to make contraceptive coverage accessible by not requiring women to research plans that offer contraceptive coverage, purchase separate contraceptive coverage, or even sign up with a different entity or program. *See id.* As the Supreme Court acknowledged in *Hobby Lobby*, the Departments designed the accommodation so that it has "precisely zero" impact on female plan participants and beneficiaries. 134 S. Ct. at 2760; *see also id.* at 2759 (explaining the accommodation "ensur[es] that the employees of [eligible organizations] have precisely the same access to all FDA-approved contraceptives as employees of companies whose owners have no religious objections to providing such coverage").[37]

Providing women with such seamless coverage should result in a lower unintended pregnancy rate. Medical evidence reflects a causal relationship between the accessibility of contraceptives and the unintended pregnancy rate: "progress in reducing the rate of unintended pregnancy would be possible by making contraceptives more available, accessible, and acceptable." IOM Report at 104 (internal quotation marks omitted); *see also id.* at 109 ("[C]ost-sharing requirements, such as deductibles and copayments, can pose barriers to care and result in reduced use of preventative and primary care services, particularly for

---

[37] We acknowledge that the Supreme Court in *Hobby Lobby* expressly declined to decide whether the accommodation violated RFRA. Nonetheless, our analysis is consistent with the Court's dicta.

low-income populations."); Dianne Greene Foster, et al., *Number of Oral Contraceptive Pill Packages Dispensed & Subsequent Unintended Pregnancies*, Obstetrics & Gynecology, March 2011, at 566 (concluding that when receipt of oral contraceptives was made more convenient by dispensing them annually rather than quarterly the unintended pregnancy rate dropped by 30% and the abortion rate dropped by 46%).[38]  Because the government has demonstrated that the mandate and accommodation increase access to contraception, we conclude that the mandate and accommodation are effective ways to reduce the unintended pregnancy rate.  Accordingly, they serve the government's compelling interests of

---

[38] The government's evidence further shows that when contraception is easily accessible, women not only use it more often, they select more effective methods of contraception.  In research studies, "when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods."  IOM Report at 109.  These methods include intrauterine devices and contraceptive implants, which are long-lasting and have the additional advantage of not being dependent on user compliance.  *See* Birth Control Methods Fact Sheet, Dep't of Health & Hum. Servs., Office on Women's Health, http://www.womenshealth.gov/publications/our-publications/fact-sheet/birth-control-methods.html (July 16, 2012) (showing that implants and intrauterine devices have a failure rate of less than 1 percent, compared to 5 percent for oral contraceptives and 11 to 16 percent for male condoms).

These longer-acting contraceptive methods have been underutilized in the United States compared to other developed countries where unintended pregnancy rates are lower, Jeffrey F. Peipert, et al., *Preventing Unintended Pregnancies by Providing No-Cost Contraception*, Obstetrics & Gynecology, Dec. 2012, at 1291, in large part because they pose higher up-front costs that discourage use.  *See* IOM Report at 108.  Evidence shows that women's use of long-acting contraceptive methods easily can be increased by making the methods cheaper and more readily available.  In a study that provided intrauterine devices and implanted contraceptives at no cost to study participants, researchers found a significant decrease in unintended pregnancy and abortion rates in the study population.  The study concluded that "[u]nintended pregnancies may be reduced by providing no-cost contraception and promoting the most effective contraceptive methods."  *See* Peipert, *supra*, at 1291.

improving the health of women and children and assuring that women receive health benefits that meet their needs as well as the health care provided to men does.

Of course, a compelling interest alone is insufficient to satisfy RFRA; we must also assess "the marginal interest in enforcing" the challenged law against the religious adherents in question. *Hobby Lobby*, 134 S. Ct. at 2779. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)); *see also Yoder*, 406 U.S. at 221 ("Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim [of compelling interest]; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote . . . and the impediment to those objectives that would flow from recognizing the claimed . . . exemption.").

*Yoder* provides a good example of the application of this principle. There, the Amish plaintiffs challenged Wisconsin's law requiring high school attendance until the age of 16. *Yoder*, 406 U.S. at 207-08. The government asserted that the law was justified by a general interest in the virtues of universal education. *Id.* at

59

213-14.  The Supreme Court was unsatisfied with this interest as it applied to the plaintiffs.  "[T]he evidence adduced by the Amish . . . [was] persuasively to the effect that an additional one or two years of formal high school *for Amish children* in place of their long-established program of informal vocational education would do little to serve [the government's stated] interests."  *Id.* at 222 (emphasis added).

Similarly, the government's argument in *O Centro* exemplifies an overly generalized interest.  The plaintiffs, a religious sect with origins in the Amazon rainforest, challenged the Controlled Substances Act's regulation of *hoasca*, a hallucinogenic tea they used in religious ceremonies.  The federal government argued that it had "a compelling interest in the uniform application of the Controlled Substances Act, such that no exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere religious practice."  *O Centro*, 546 U.S. at 423.  The Supreme Court dismissed this slippery slope argument, which it said "could be invoked in response to any RFRA claim for an exception to a generally applicable law," because it failed to consider the limited effect of an exception for the particular plaintiffs, and its stated need for universal application was undermined by the existence of other exceptions.  *Id*. at 435-36.

In contrast to *Yoder* and *O Centro*, here the government's stated interests all concern the law's application to these particular plaintiffs.  The government argues that applying the accommodation procedure to the plaintiffs in these cases furthers

its interests because the accommodation ensures that the plaintiffs' female plan participants and beneficiaries—who may or may not share the same religious beliefs as their employer—have access to contraception without cost sharing or additional administrative burdens as the ACA requires. Unlike the exception made in *Yoder* for Amish children, whom the Supreme Court found had an adequate substitute for additional formal education to refute the government's compelling interest, here the IOM Report's findings of poor health outcomes related to unintended or poorly timed pregnancies apply to the plaintiffs' female plan participants or beneficiaries and their children just as they do to the general population.

Moreover, the accommodation's requirement that the plaintiffs inform their TPAs or HHS of their religious objection is essential to achieving the government's compelling interests. It ensures that a TPA is aware when it has an obligation to provide contraceptive coverage so that the women covered by these plans can receive coverage if they want it, without gaps in such coverage. The notification also guarantees that the Departments will be able to identify objecting organizations, like the plaintiffs, to make sure that the accommodation procedures work (that is, to independently ensure that the women covered by the plaintiffs' plans are receiving the coverage to which they are entitled). Thus, the government's interests are sufficiently particular to satisfy the *O Centro* standard.

61

      **(c)**      **The Exceptions to the Mandate and Accommodation Do Not Undermine the Government's Compelling Interest.**

The plaintiffs argue that the government's interests in providing broad contraceptive coverage cannot be compelling because the ACA provides exemptions from the mandate for other types of employers—namely, those (1) with grandfathered health plans, (2) with fewer than 50 employees, and (3) that qualify as "religious employers." We disagree.

First, the existence of grandfathered plans does not undermine the government's compelling interest in providing contraceptive coverage because grandfathered plans are only a short-lived, transitional measure intended to ease the burden of compliance with the ACA's sweeping reforms. 78 Fed. Reg. at 39887 n.49 ("[T]he Affordable Care Act's grandfathering provision is only transitional in effect, and it is expected that a majority of plans will lose their grandfathered status by the end of 2013."). To be grandfathered, a plan must continue to provide virtually the same benefits for the same percentage cost sharing as the plan had in effect on March 23, 2010. 45 C.F.R. § 147.140(g)(1)(ii). It becomes difficult to comply with these requirements over time. *See, e.g.,* Second Am. Compl. at 23-24, No. 1:12-cv-03489, Doc. 56 (describing the Atlanta Archdiocese's inability to afford to maintain its grandfathered plan past January 1, 2014).

Research by the Kaiser Family Foundation demonstrates that the percentage of workers covered by grandfathered plans has rapidly declined: 26 percent in 2014, down from 36 percent in 2013, 48 percent in 2012, and 56 percent in 2011. Kaiser Family Found. & Health Research & Ed. Trust, Employer Health Benefits 2015 Annual Survey at 218 (Sept. 22, 2015).[39]  In addition, some employees covered by grandfathered plans may in fact be receiving contraceptive benefits without cost sharing because, though not required to do so, their plans may include such a benefit.

As an additional consideration, we do not wish to penalize the government for phasing in the ACA's requirements to help businesses adjust to a new health care regulatory landscape.  *Cf. Heckler v. Mathews*, 465 U.S. 728, 746 (1984) ("We have recognized, in a number of contexts, the legitimacy of protecting reasonable reliance on prior law even when that requires allowing an unconstitutional statute to remain in effect for a limited period of time. . . .  The protection of reasonable reliance interests is . . . a legitimate governmental objective.").  Accordingly, even if the mandate and accommodation are phased in

---

[39] We acknowledge that the Kaiser Family Foundation's 2015 data shows that 25% of covered workers are enrolled in a grandfathered plan, which is not much less than the 26% in 2014.  But the Foundation reported that many employers were confused and unsure about whether their plans remained grandfathered, suggesting that employers may have inaccurately reported that they had grandfathered plans.  Kaiser Family Found., *supra*, at 214.

63

over time, the gradual implementation is insufficient to undermine the government's compelling interest.

Second, the ACA's treatment of employers with 50 or fewer employees as exempt from the "employer mandate" and therefore not required to provide employees with health insurance at all, *see* 26 U.S.C. § 4980H(a)(c)(2)(A), does not undercut the government's compelling interests. If, on the one hand, smaller employers do not provide insurance coverage, then their employees must purchase health plans on the health insurance exchanges or face tax penalties. *See id.* § 5000A(a), (b)(1). And plans purchased on the exchanges will include contraceptive coverage. *See* 42 U.S.C. § 300gg-13(a)(4). If, on the other hand, smaller employers choose to provide health insurance, then their plans are subject to the contraceptive mandate. *See id.* The employees of small businesses therefore will receive contraceptive coverage regardless of whether their employers are exempt from providing health insurance. This exemption reflects a practical recognition that small businesses have different financial realities from larger businesses. It in no way undermines the government's interest in providing contraceptive coverage without cost sharing because small businesses' employees end up with health plans subject to the contraceptive mandate whether the employers provide health insurance or not.

64

Third, the exemption from the contraceptive mandate for religious employers does not weaken the government's stated interests. Under the HRSA guidelines, the contraceptive mandate does not apply to a group health plan run by a religious employer, defined by the regulations as "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). In finalizing the regulations, the Departments declined to extend the exemption to other organizations that have religious objections to the mandate because:

> Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

78 Fed. Reg. at 39874.

The exemption for religious employers attempts to balance the need for contraceptive coverage with our nation's longstanding history of deferring to a house of worship's decisions about its internal affairs. *See* 76 Fed. Reg. at 46623 ("[T]he Departments seek to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions."); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 704-06 (2012) (describing history of non-

65

interference with internal affairs of houses of worship). The government undoubtedly has a compelling interest in respecting the values of religious employers and their employees, and pursuing that interest does not undermine the government's equally compelling interest in improving women's and the public's health by making contraceptives easier to obtain. Especially with regard to sweeping legislation like the ACA, the government is often faced with competing compelling interests. Courts may allow the government to balance those interests without undermining any individual compelling interest. *See Hobby Lobby*, 134 S. Ct. at 2780 ("Even a compelling interest may be outweighed in some circumstances by another even weightier consideration.").

We also reject the plaintiffs' argument that the Departments' distinction between houses of worship (which are exempted from the mandate) and other organizations with religious affiliation (which must seek an accommodation) is illogical. Although it may not universally hold true,[40] it is a common-sense notion that a church's employees likely share more beliefs with the church than do the employees of, for example, a school linked to that church, and therefore the employees of a church that objects to contraception are less likely to use contraceptive coverage even if it is available. *See* 78 Fed. Reg. at 39874. Thus,

---

[40] EWTN in particular argues that the Departments' distinction between houses of worship and other religious organizations is illogical and does not hold for EWTN because, like employees of "religious employers," its employees share its religious convictions.

66

the Departments distinguished between houses of worship and other religious groups using the readily available and well-established IRS tax status test. This test is predictable for affected organizations and easy for the Departments to implement. *See United States v. Lee*, 455 U.S. 252, 260-61 (1982) (noting it was reasonable for Congress to exempt self-employed Amish from Social Security taxes because the exemption for "the self-employed provided for a narrow category which was readily identifiable . . . [and] distinguishable from the generality of wage earners employed by others"). We do not think that the Departments' decision to exempt houses of worship based on a bright-line test while accommodating other religious organizations undercuts the government's compelling interests in enforcing the contraceptive mandate.

In sum, the mandate and accommodation further the government's compelling interests by ensuring that women have contraceptive coverage without cost sharing or additional administrative hurdles. Additionally, by requiring organizations that opt out of the mandate to identify themselves, the government ensures that these organizations' health plan participants and beneficiaries can receive the coverage seamlessly through other channels. Although the government has attempted to accommodate religious freedom as well as the needs of businesses, it has not done so in a way that undermines its goal of ensuring access to contraception.

### (ii)    The Mandate and Accommodation Are the Least Restrictive Means of Furthering the Government's Compelling Interests.

As a final step, we must determine whether the mandate and accommodation are "the least restrictive means of furthering" the government's compelling interests. 42 U.S.C. § 2000bb-1(b). This test is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. The government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the [plaintiffs]." *Id.* When a less restrictive alternative serves the government's compelling interest "equally well," the government must use that alternative. *Id.* at 2782; *see id.* at 2786 (Kennedy, J. concurring) (considering whether alternative "equally furthers the Government's interest").

In determining whether potential alternatives to the mandate and accommodation equally further the government's interests, we must consider both the cost to the government and the burden the alternatives impose on the affected women. *See id.* at 2760 (majority opinion) ("[W]e certainly do not hold or suggest that RFRA demands accommodation of a for-profit corporation's religious beliefs no matter the impact that accommodation may have on thousands of women employed by Hobby Lobby. The effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be *precisely zero*." (emphasis added) (alteration, footnote, citation,

68

and internal quotation marks omitted)); *id.* at 2760 (clarifying that the Court did not hold that "corporations have free rein to take steps that impose disadvantages on others or that require the general public to pick up the tab" (alteration and internal quotation marks omitted)).  Because there are no less restrictive means available that serve the government's interests equally well, we hold that the mandate and accommodation survive strict scrutiny under RFRA.

Although the plaintiffs and the dissent suggest several potential less restrictive alternatives to the mandate and accommodation, their proposals fail to achieve the government's interests as effectively.  Indeed, their proposals impose burdens on women that would make contraceptives less accessible than they currently are.  Because these proposals cannot be expected to reduce the rate of unintended pregnancies and thereby improve the health of women and children as effectively as the mandate and accommodation, they do not qualify as less restrictive alternatives under RFRA.

Previously, the Supreme Court and a member of this Court suggested that a less restrictive alternative would be to allow eligible organizations to notify HHS of their opt out, instead of having to provide Form 700 to their plan providers or TPAs.  *See Wheaton Coll.*, 134 S. Ct. at 2807; *Eternal Word Television Network*, 756 F.3d at 1349 (William Pryor, J., concurring) ("The United States, for example, could require the Network to provide a written notification of its religious

69

objection to the Department of Health and Human Services, instead of requiring

the Network to submit Form 700—an instrument under which the health insurance

plan is operated—to the third-party administrator.").  The Departments have

responded to and addressed this concern by revising the accommodation

procedures to allow eligible organizations notify HHS directly of their desire to opt

out of the contraceptive mandate.  79 Fed. Reg. at 51094-95.  With that potential

alternative incorporated into the regulatory scheme, we turn to the alternatives

proposed by the plaintiffs and the dissent.

### (a)    The Plaintiffs' Proposals

The plaintiffs propose two less restrictive alternatives.  First, they suggest

that the government could pay directly for all contraceptive coverage, in effect a

single-payer system for contraceptives only,[41] either by creating a new government

program or expanding an existing one.[42]  Either way Congress would need to pass

legislation that would fundamentally change how the majority of American women

---

[41] In a single-payer system, the government—as opposed to employers, health insurers, or patients—pays for healthcare services.  *See Notre Dame II*, 786 F.3d at 615; *Single-Payer*, Merriam Webster Dictionary, http://www.merriam-webster.com/dictionary/single-payer (last visited Feb. 12, 2016).  Although the plaintiffs never call their proposal a "single-payer" system for contraceptives, the label applies because they propose a system in which the government would be the sole payer for contraceptives and related services.  It is important to note that all other health care would continue to be provided through our existing system.

[42] The plaintiffs suggest, for example, that Congress could expand Title X, which currently benefits only low-income families; patients whose income exceeds 250 percent of the poverty level must pay for any services they receive through Title X programs.  *See* 42 U.S.C. § 300a-4(c); 42 C.F.R. § 59.5(a)(8).

receive their healthcare coverage for contraception.[43]  *See* Jessica C. Smith & Carla Medalia, U.S. Census Bureau, Health Insurance Coverage in the U.S.: 2014 at 3 (2015) (55% of Americans had insurance coverage provided by an employer in 2014).  Among other things, adopting a single-payer system for contraception would require Congress to squeeze insurance companies out of an entire segment of the health insurance business.[44]  Second, the plaintiffs assert that the government could provide tax credits to reimburse women for purchasing contraceptive coverage.[45]  Under either the single-payer or tax credit proposals, all coverage for contraception and related services would operate outside the existing, largely employer-based, insurance system.

---

[43] In *Hobby Lobby*, the government argued that RFRA does not permit the court to consider proposals that would require the government to create entirely new programs as less restrictive alternatives.  The Court rejected this argument, explaining "we see nothing in RFRA that supports this argument."  *Hobby Lobby*, 134 S. Ct. at 2781.  Accordingly, we consider this proposal even though it would require substantial congressional action to expand significantly an existing program or create a new one.

[44] We may, of course, consider the burdens that a proposed alternative places on nonbeneficiaries, such as insurance companies.  *See Cutter v. Wilkinson,* 544 U.S. 709, 720-722 (2005) ("[A]pplying RLUIPA, courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries. . . .  Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.").

[45] The plaintiffs suggest the government could require women to purchase separate contraceptive coverage on the healthcare exchanges and then offer tax credits to offset the cost of purchasing the coverage.  This proposal would require Congress to amend the ACA because the exchanges are statutorily restricted to selling only full health insurance policies.  *See* 42 U.S.C. §§ 18021(a)(1)(B), 18022(a), (b).

71

Most importantly, these proposals are not less restrictive alternatives because they would not serve the government's interests "equally well."[46]  *Hobby Lobby*, 134 S. Ct. at 2782.  As the Departments explain, these proposals would cause all women who have existing contraceptive coverage through group health insurance plans to lose such coverage, forcing them instead to "take steps to learn about, and to sign up for, a new health benefit."  78 Fed. Reg. at 39888.  Indeed, under these proposals, women would have one employer-provided health insurance plan covering healthcare other than contraception.  Then, they would have to take additional, separate steps to secure contraceptives or contraceptive coverage.  Under a single-payer system for contraceptives, they would have to research the federal entitlement for contraceptives and register for the program.  Under a tax-credit system, they would have to research plans offering separate contraceptive coverage, select a plan, purchase coverage, and later file for a tax credit as part of their individual tax returns.[47]  The mandate and accommodation present an easier,

_____

[46] We acknowledge dicta in *Hobby Lobby* suggesting as a less restrictive alternative that the government pay directly for contraception; however, the Supreme Court did not hold that such a program was a less restrictive alternative.  134 S. Ct. at 2871-82 ("[W]e need not rely on the option of a new, government-funded program in order to conclude that the HHS regulations fail the least-restrictive-means test.").

[47] The tax-credit proposal is particularly problematic because it forces women to pay up front for contraceptives in exchange for tax credits later.  But many women simply would not be able to afford to wait a year for a refund from the government in the form of a tax credit and, as the government's evidence shows, would instead have to forgo using contraceptives.  *See* IOM Report at 109 (recognizing that "cost-sharing requirements, such as deductibles and copayments, can pose barriers to care and result in reduced use of preventive . . . services"); *see also supra*

72

simpler, and more certain path for women by ensuring that, by obtaining health insurance, they also secure contraceptive coverage, even when their employers opt out.

Because plaintiffs' proposals impose greater barriers to contraceptive access than exist under the mandate and accommodation, their proposals likely will lead to lower rates of contraceptive usage (along with use of less effective forms of contraception), meaning these proposals will be less effective at preventing unintended pregnancies and concomitant health consequences.[48]  *See* IOM Report at 104-09; Foster, *supra*, at 566 (reflecting that when obtaining contraceptives became less convenient, the rate of unintended pregnancy increased); *see also* 78 Fed. Reg. at 39888 (recognizing that these proposals would be "less effective than the employer-based system of health coverage in advancing the government's compelling interests").

Plaintiffs' proposals would make contraception less accessible not only to women who currently receive contraceptive coverage through a group insurance

_____

note 38.  In contrast, the mandate and accommodation require women to pay nothing upfront for contraceptives.  Accordingly, contraceptives are significantly more available to women under the mandate and accommodation than they would be under the tax-credit proposal.

[48] The two other circuit courts to address this issue have rejected similar alternatives for the same reason.  *See Notre Dame II*, 786 F.3d at 616-17 (rejecting similar proposed alternatives because they "would impede the receipt of [contraceptive] benefits"); *Priests for Life I*, 772 F.3d at 265 (holding that proposed alternatives "would not serve the government's compelling interest with anywhere near the efficacy of the challenged accommodation and would instead deter women from accessing contraception").

plan, but also to women who currently purchase health insurance through the exchanges, including women who work for an employer with fewer than 50 full-time employees.  Under the current framework, these women must research and compare potential health insurance plans sold on the exchanges and then purchase and sign up for a plan.  As a result of their efforts, they receive health insurance that includes contraceptive coverage.  *See* 42 U.S.C. § 300gg-13(a)(4).  Under the plaintiffs' proposals, these women would still have to procure health insurance from the exchanges.  But then they would have to take the additional steps described above to obtain coverage for contraceptives.  In other words, women who currently purchase insurance through the exchanges would also face greater burdens accessing contraceptives under a single-payer system.[49]

---

[49] It is unclear whether our dissenting colleague advocates as a less restrictive alternative replacing our insurance-based system with a single-payer system for contraceptive coverage.  On the one hand, the dissent never states that a single-payer system would be a less restrictive alternative, instead proposing that the ACA and ERISA need only a "slight[] tweak," not the jettisoning of our insurance-based system for contraceptives that a single-payer system would entail.  Dissent at 137.  On the one other hand, the dissent argues that the government should "provid[e] for contraceptive coverage directly without the accommodation's administrative rigmarole" so that the government could "offer cost-free access to each and every woman in the United States."  *Id.* at 134.  This sounds to us like a single-payer system.

Indeed, the dissent suggests that a single-payer system would be as effective or more effective than the mandate and accommodation at making contraceptives accessible to women.  Because under either system women pay nothing for contraceptives, to compare women's access to contraceptives under the two systems, we must focus on the administrative burdens that women face under either system.

We conclude that, on the whole, women face fewer barriers to obtaining contraceptives under the mandate and accommodation than they would under a single-payer system.  Most significantly, most women covered by group health insurance plans and all who purchase insurance on the exchanges seamlessly receive coverage under the mandate and accommodation.

After careful consideration, we conclude that the government has shown that

contraceptives would be less accessible—and used less frequently or effectively—

under the plaintiffs' proposals then they are under the mandate and

Nonetheless, the dissent asserts that a single-payer system is a more effective way to improve access to contraceptives because three categories of women whose employers are exempt from the contraceptive mandate—(1) women employed by small businesses, (2) women covered by grandfathered plans, and (3) women employed by churches or church-affiliated organizations— would have greater access to contraceptives under such a system. *See id.* at 50. After considering these three categories, we remain convinced that a single-payer system would be less effective than the mandate and accommodation.

First, the dissent suggests that women whose employers have 50 or fewer full-time employees would receive better access to contraceptives under a single-payer system. But, as we explained above, these women receive contraceptive coverage under the mandate and accommodation regardless of whether their employers elect to provide health insurance coverage or they purchase a plan on the exchanges. *See supra* Part III.A.2.c.(i).(c). Given that these women currently have seamless access to contraceptives, we fail to see how this group supports the dissent's argument.

Second, the dissent asserts that women whose health plans have a grandfathered exemption would have better access to contraceptives under a single-payer system. But the dissent overlooks that the grandfathered exemption is a temporary measure, meaning the number of women covered by plans subject to the exemption has rapidly declined and should continue to decline over time because it becomes more expensive for plans to maintain their grandfathered status. *See* 45 C.F.R. § 147.140(g)(1) (requiring grandfathered plans to provide virtually the same benefits for the same percentage cost sharing that the plan had in effect on March 2010). We cannot say that a single-payer system serves the government's interest as effectively or more effectively simply because in the short term a subset of women may have easier access to contraceptives under a single-payer system.

Third, the dissent argues that women employed by churches and church-affiliated organizations would have easier access to contraceptives under a single-payer system. Even if that is true for this relatively small group of women, the Departments have explained that these employees are likely to share their employer's religious objection to contraception, meaning they are "less likely than other people to use contraceptive services even if such services were covered under the plan." 78 Fed. Reg. at 39874. All together, we cannot say that a single-payer system serves the government's interest as effectively as the mandate and accommodation when we consider that a single-payer system would impose greater barriers to accessing contraceptives for most women who purchase health insurance from an employer and all women who purchase plans on the exchanges. What's more, the balance tips even further in favor of the mandate and accommodation when we consider the impact of imposing on non-beneficiaries a single-payer system for an entire segment of preventative care. *See Cutter*, 544 U.S. at 720.

accommodation.  Given the government's compelling interest in minimizing the barriers women face in accessing contraceptives so that they will use contraceptives to lower the rate of unintended pregnancies, we conclude that the plaintiffs' proposals would not serve the government's interest equally as well as the mandate and accommodation.  Thus, they fail to qualify as less restrictive alternatives.

The dissent criticizes our position as giving the Departments a "free pass" on the least restrictive means requirement.  Dissent at 139.  Our dissenting colleague takes our analysis to mean that the government can defeat a potential alternative merely by showing that the alternative would take away a benefit—any benefit— that the government's existing framework provides to "third parties" (here, the women who are the intended beneficiaries of the mandate and accommodation).  *Id.* at 138.  The dissent overstates our position.  We are not saying that the government can always overcome strict scrutiny by showing that proposed alternatives would take away a benefit that the current framework provides.  Rather, on the facts and record of this case—including the evidence that when women face greater burdens (whether financial or administrative) in accessing contraceptives or contraceptive coverage, they are less likely to use contraceptives—we must conclude that plaintiffs' alternatives, which make contraceptives less accessible, would be significantly less effective than the

mandate and accommodation at reducing the rate of unintended pregnancies and thus would thwart the government's interests.[50]

### (b)   The Dissent's Proposal

The dissent suggests that Congress could "slightly tweak" the ACA and ERISA to "eliminate the need for eligible organizations to affirmatively designate the third-party administrators of their health plans." Dissent at 137. We understand the dissent's proposal to be that Congress should pass legislation and the Departments should enact regulations that would designate the TPA for a self-insured eligible organization as plan administrator for purposes of contraceptive coverage without requiring the eligible organization to communicate its religious objection to anyone.

The dissent's proposal fails to serve the government's interest equally as well as the accommodation because the alternative would make contraceptives less accessible to women covered by eligible organizations' plans than would the accommodation. The dissent fails to explain—and we cannot imagine—how a TPA would know when an employer has a religious objection to providing contraceptive coverage under the proposal and thus that the TPA is required to

---

[50] The Eighth Circuit's proposal that "the government could pay for the distribution of contraceptives at community health centers, public clinics, and hospitals with income-based support" likewise would impose additional administrative burdens on women and thus in a similar way fails to satisfy the government's interests. *Sharpe Holdings*, 801 F.3d at 945.

77

provide the coverage in the employer's stead if the employer is not required to notify anyone. Like the TPAs, the government must also be able to identify women whose employers object on religious grounds to providing contraceptive coverage. Otherwise, the government will be unable to ensure that the participants and beneficiaries of the abstaining organization's health insurance plan receive the coverage the law mandates. Without an effective way to identify any gaps, the government would be hamstrung in its ability to accommodate employers' sincerely held religious beliefs while also pursuing the interests that Congress intended to achieve in passing the Women's Health Amendment.[51]

---

[51] The Eighth Circuit suggested as a less restrictive alternative that the Departments revise the regulations governing the accommodation to remove the requirement that when notifying HHS of its religious objection, an eligible organization must identify its TPA and provide the TPA's contact information. *Sharpe Holdings*, 801 F.3d at 944. The Eighth Circuit concluded that this alternative would be "less onerous" than the current regulations yet "permit[] the government to further its interests." *Id.* The Eighth Circuit relied on the fact that when the Supreme Court in *Wheaton College* created an accommodation, the Court required the college only to notify HHS that it had an objection to providing coverage for contraceptive services, and not to identify its TPA. *Id.*

We disagree with the Eighth Circuit that this alternative would serve HHS's interests equally well. As the Departments explained, the information required under the regulations is "necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the policies in the . . . final regulations." 79 Fed. Reg. at 51095. The Eighth Circuit has not explained why this is not so. Although the Supreme Court in *Wheaton College* did not require the college to identify its TPA to HHS to receive an accommodation, the information was unnecessary because HHS already knew the identity of the college's TPA. *See Wheaton College*, 134 S. Ct. at 2815 (Sotomayor, J., dissenting) ("HHS is aware of Wheaton's third-party administrator in this case."). Thus, *Wheaton College* does not suggest that HHS could administer the mandate and accommodation in other cases without requiring an eligible organization to identify its TPA.

78

The dissent's proposal would create gaps or delays in contraceptive coverage for plan participants and beneficiaries of eligible organizations that refuse to provide contraceptive coverage or tell anyone of their objection. Until the insured, the TPA, or HHS learned of the silent omission of contraceptive coverage, these women would be denied the contraceptive coverage to which they are irrefutably entitled. During this period, such eligible organizations would, in effect, be imposing their religious beliefs on women who wish to take advantage of their rights under federal law. These gaps in contraceptive coverage would frustrate the government's interests. Because the dissent's proposal substantially burdens religious exercise and fails to meet the government's compelling interests, it cannot constitute a less restrictive alternative.[52]

---

[52] We pause to note that if we assume that the dissent's substantial burden analysis is correct—meaning the only objective inquiry for determining whether there is a substantial burden is the magnitude of the penalty, *see* Dissent at 116—then the dissent's proposal would substantially burden the plaintiffs' religious exercise. Presumably the dissent's position is that the proposal presents a satisfactory alternative because it requires no "affirmative participation" by the objecting organization. *Id.* at 139. In fact, though, a TPA's obligation to provide contraceptive coverage to a specific plan participant or beneficiary would remain tied to and—in some limited way—"triggered" by actions taken by the organization. An eligible organization is required to take two actions before its TPA becomes obligated to provide contraceptive coverage to a specific plan participant or beneficiary: the eligible organization must (1) contract with a specific TPA to provide administrative services for its plan and (2) notify the TPA of the individuals covered by its plan. Unless an eligible organization hired a specific TPA and provided a list of its insureds, those insureds would never receive contraceptive coverage from the TPA, even under the dissent's proposal. *See Notre Dame II*, 786 F.3d at 617 (explaining that under a similar proposal when a university hired an unemployed person who "by virtue of becoming employed by [the organization], obtained contraception coverage for the first time," the university's acts would "'trigger[]' the new employee's access to contraception").

We hold that, even if the accommodation substantially burdens the plaintiffs' religious exercise, it does not violate RFRA because it is the least restrictive means of furthering the government's compelling interests in the contraceptive mandate.

## B.    EWTN'S Free Exercise Claims

Plaintiff-appellant EWTN additionally claims that the contraceptive mandate violates the Free Exercise Clause of the First Amendment.  The Supreme Court's *Smith* decision continues to apply to Free Exercise claims outside of the RFRA context; thus, neutral and generally applicable laws need not be justified by any compelling interest even if those laws incidentally burden religious exercise. *Smith*, 494 U.S. at 885.  A law is neutral unless "the object of a law is to infringe upon or restrict practices because of their religious motivation." *Lukumi Babalu*

---

The plaintiffs' religious objections to taking acts that "trigger[]" contraceptive coverage, "facilitat[e]" access to contraceptives, or render them "complicit" in a scheme that provides access to contraceptives apply with equal force to the dissent's proposal.  *See* EWTN Reply Br. at 5, 10-11; Catholic Charities and CENGI Appellee Br. at 10, 13, 20.  Indeed, Catholic Charities and CENGI alleged in their complaint that their "religious beliefs prohibit them from contracting with [a] . . . third-party administrator that will, as a direct result, procure or provide the objectionable coverage to [their] employees."  Second Am. Compl. at 49, No. 1:12-cv-03489-WSD, Doc. 56.  We acknowledge that the dissent's proposal does not require an eligible organization to tell HHS or its TPA that it has a religious objection to providing contraceptive coverage.  But the plaintiffs do not claim that the government imposes a substantial burden by forcing them to state that they have a religious objection.  Rather, they claim a substantial burden because, they assert, their objection would cause their TPAs to provide contraceptive coverage.

80

*Aye*, 508 U.S. at 533. And a law is generally applicable if it does not "in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543. "A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32. But if a law indeed is neutral and generally applicable, "then rational basis scrutiny should be applied, requiring that the plaintiff show that there is not a legitimate government interest or that the law is not rationally related to protect that interest." *GeorgiaCarry.Org, Inc v. Georgia*, 687 F.3d 1244, 1255 n.21 (11th Cir. 2012).

Congress included the contraceptive mandate in the ACA to improve women's health and public health generally. There is no evidence whatsoever that the mandate was enacted in an attempt to restrict religious exercise. To the contrary, in implementing the contraceptive mandate the Departments have attempted to accommodate religious interests by granting exceptions for religious employers and those organizations with religious objections to providing contraceptive coverage. EWTN nonetheless argues that the mandate is non-neutral because the exemption and accommodation "discriminate[] among religious objectors, creating a three-tiered system." EWTN Appellant Br. at 54. But the regulations do not discriminate between religious denominations or infringe upon or restrict conduct because of its religious motivation. Rather, the procedures

81

distinguish among organizations on the basis of their tax status.  Thus EWTN has failed to show that the mandate is non-neutral.

EWTN also argues that the mandate is not generally applicable because the ACA carves out small employers and grandfathered plans.  For the same reasons we rejected this argument as it pertains to the plaintiffs' RFRA claim, we reject it here.  Just as these exceptions do not undermine the government's compelling interests justifying the contraceptive mandate, they do not prevent the mandate from being generally applicable as defined by *Lukumi Babalu Aye*.  The exceptions for small businesses and grandfathered plans apply equally to religious employers and non-religious employers.  The exceptions in no way "impose burdens only on conduct motivated by religious belief."  *Lukumi Babalu Aye*, 508 U.S. at 543.

Because the contraceptive mandate is neutral and generally applicable, to invalidate it the plaintiff must show that is it not rationally related to a legitimate government interest.  *See GeorgiaCarry.Org*, 687 F.3d at 1255 n.21.  EWTN cannot make such a showing.  We have already concluded that the government has a compelling (and therefore legitimate) interest in ensuring women have access to contraceptives without cost sharing.  *See supra* Part III.A.2.c.(i).  The mandate is clearly rationally related to that interest and thus passes muster under the Free Exercise Clause.

## C.    EWTN'S Establishment Clause Claim

EWTN next argues that the contraceptive mandate violates the Establishment Clause by discriminating among religious organizations. Specifically, EWTN objects to the way the exemption and accommodation distinguish between houses of worship and other types of religious organizations. As an initial matter, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987); *see also Wallace v. Jaffree*, 472 U.S. 38, 83 (1985) (O'Connor, J., concurring) ("It is disingenuous to look for a purely secular purpose when the manifest objective of a statute is to facilitate the free exercise of religion by lifting a government-imposed burden. Instead, the Court should simply acknowledge that the religious purpose of such a statute is legitimated by the Free Exercise Clause.").

Like its claim based on the Free Exercise Clause, EWTN's Establishment Clause claim fails because the accommodation does not distinguish among religious groups on the basis of denomination, but rather on non-denominational attributes of an objecting organization. The accommodation relies on tax status, which is a permissible way to distinguish between organizations for the purpose of drafting a religious exemption. "[R]eligious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other

entities, without these advantages being thought to violate the establishment clause." *Geneva Coll.*, 778 F.3d at 443 (alteration in original and internal quotation marks omitted); *see also Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 666, 672-73 (1970) (upholding a tax exemption on social welfare services that churches performed and emphasizing that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause."). We therefore reject EWTN's Establishment Clause challenge.

## D.     EWTN'S Free Speech Claim

Lastly, EWTN contends that the contraceptive mandate violates the Free Speech Clause by compelling the organization to speak in order to avail itself of the accommodation.[53] "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In *Wooley*, the plaintiff objected to the slogan on New Hampshire's license plate: "Live Free or Die." *Id.* at 707-08. He argued that by criminalizing his efforts to cover up the slogan, the government forced him to express a message contrary to his beliefs. The Supreme Court agreed that the license plate was forced

---

[53] EWTN's Free Speech claim that the regulations compel silence is moot because the Department removed the non-interference provisions from the regulations in 2014. 79 Fed. Reg. at 51095.

speech.  The Court then applied *United States v. O'Brien*, 391 U.S. 367 (1968), to hold that the government's stated interest in identifying passenger cars was not sufficiently compelling because passenger cars could be identified in other ways. *Id.* at 715-17.

Assuming, *arguendo*, that the act of filling out Form 700 or notifying HHS implicates the Free Speech Clause, this Court must ask whether the government's "countervailing interest is sufficiently compelling to justify" the forced speech.  *Id.* at 716.  Our disposition of the plaintiffs' RFRA claims decides the issue.  Because the government has a compelling interest in ensuring that women have access to contraceptive care without additional financial or administrative burden, it may force the plaintiffs to speak simply to opt out of the mandate.

## IV.    CONCLUSION

We hold that the accommodation for the contraceptive mandate does not violate RFRA because it does not substantially burden the plaintiffs' religious exercise and because the government's regulatory scheme is the least restrictive means of furthering its compelling interests.  The regulations also do not violate the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment.  With regard to EWTN, we affirm the district court's grant of summary judgment to the government.  With regard to CENGI and Catholic Charities, we vacate the district court's grant of summary judgment on the

plaintiffs' RFRA claim and remand to the district court with instructions to grant the government's summary judgment motion.

* * *

The question of whether the mandate and accommodation violate RFRA is currently before the Supreme Court in *Zubik v. Burwell*, Nos. 14- 1376 and 14- 1377, and other consolidated cases.  The Supreme Court will hold oral argument in these cases on March 23, 2016.  Because the Supreme Court will soon render a decision addressing this issue, we believe it is appropriate to stay enforcement of the mandate and accommodation against the plaintiffs until the Supreme Court issues a decision.  Accordingly, the Secretary of Health and Human Services is enjoined from enforcing against EWTN, Catholic Charities, and CENGI the substantive requirements set forth in 42 U.S.C. § 300gg-13(a)(4) and from assessing fines or taking other enforcement action against EWTN, Catholic Charities, or CENGI for non-compliance.  The parties are directed to file a notice with this Court once the Supreme Court has issued its decision in *Zubik*.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**APPENDIX: FORM 700**

**EBSA FORM 700- CERTIFICATION**
(revised August 2014)

This form may be used to certify that the health coverage established or maintained or arranged by the organization listed below qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-2713 A, 29 CFR 2590.715-2713A, and 45 CFR 147.131. Alternatively, an eligible organization may also provide notice to the Secretary of Health and Human Services.

Please fill out this form completely. This form should be made available for examination upon request and maintained on file for at least 6 years following the end of the last applicable plan year.    |

| | |
|---|---|
| Name of the objecting organization | |
| Name and title of the individual who is authorized to make, and makes, I this certification on behalf of the organization | |
| Mailing and email addresses and phone number for the individual listed above | |

I certify the organization is an eligible organization (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered.

Note: An organization that offers coverage through the same group health plan as a religious employer (as defined in 45 CFR 147.131(a)) and/or an eligible organization (as defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713 A(a); 45 CFR 147.131(b)), and that is part of the same controlled group of corporations as, or under common control with, such employer and/or organization (within the meaning of section 52(a) or (b) of the Internal Revenue Code), is considered to meet the requirements of 26 CFR 54.9815-2713 A(a)(3), 29 CFR 2590.715-2713 A(a)(3), and 45 CFR 147.131(b)(3).

*I declare that I have made this certification, and that, to the best of my knowledge and belief, it is true and correct. I also declare that this certification is complete.*

Signature of the individual listed above

Date

## APPENDIX: FORM 700

The organization or its plan using this form must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.

Notice to Third Party Administrators of Self-Insured Health Plans

In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(l)(iv) or 29 CFR 2590.715-2713(a)(l)(iv) constitutes notice to the third party administrator that the eligible organization:

(1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713 A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.

As an alternative to using this form, an eligible organization may provide notice to the Secretary of Health and Human Services that the eligible organization has a religious objection to providing coverage for all or a subset of contraceptive services, pursuant to 26 CFR 54.9815-2713A(b)(l)(ii)(B) and (c)(l)(ii), 29 CFR 2590.715-2713A(b)(l)(ii)(B) and (c)(l)(ii), and 45 CFR 147.13l(c)(l)(ii). A model notice is available at: http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.

This form or a notice to the Secretary is an instrument under which the plan is operated.

PRA Disclosure Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1210-0150. An organization that seeks to be recognized as an eligible organization that qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing may complete this self-certification form, or provide notice to the Secretary of Health and Human Services, in order to obtain or retain the benefit of the exemption from covering certain contraceptive services. The self-certification form or notice to the Secretary of Health and Human Services must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974, which generally requires records to be retained for six years. The time required to complete this information collection is estimated to average 50 minutes per response, including the time to review instructions, gather the necessary data, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Labor, Employee Benefits Security Administration, Office of Policy and Research, 200 Constitution Avenue, N.W., Room N-5718, Washington, DC 20210 or email ebsa.opr@dol.gov and reference the OMB Control Number 1210-0150.

ANDERSON, Circuit Judge, concurring:

I join Judge Jill Pryor's opinion for the court in its entirety. I write separately only to emphasize one point already made in the opinion. Plaintiffs seem to suggest, as a less restrictive means, that a religious employer be allowed to opt out without notifying anyone – without requiring even the de minimis notice to Health and Human Services ("HHS") pursuant to the most recent alternative notice provided for in the Regulations. However, the necessary consequence of such an automatic opt-out would be the imposition of plaintiffs' religious beliefs on their female employees. In other words, if HHS were not able to identify which employers have opted out, the employees of such employers would not receive contraceptive coverage, at least until they happened to sua sponte discover that their employer had opted out, and until such employees happened to sua sponte discover their statutory entitlement. Only then would such employees be in position to notify HHS, and begin their coverage. Such an automatically exempted employer – notifying no one of its decision to opt out -- would at least temporarily impose its own religious beliefs on its employees and deprive them of the coverage to which they are entitled under the statute and regulations. RFRA does not require that construction of the law. Rather, the Supreme Court in Hobby Lobby recognized that "RFRA took the position that 'the compelling interest test as set forth in prior Federal rulings is a workable test for striking sensible balances

90

between religious liberty and competing prior governmental interests.'"  Burwell v. Hobby Lobby Stores, Inc., 537 U.S. __, __, 134 S. Ct. 2751, 2785 (2014)(quoting from the express RFRA provision cited and quoted below).  See also Cutter v. Wilkinson, 544 U.S. 709, 720, 125 S. Ct. 2113, 2121 (2005)("Properly applying RLUIPA, courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries"); id. at 722, 125 S. Ct. at 2122-23 ("Our decisions indicate that an accommodation must be measured so that it does not override other significant interests . . .. We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way.").  Indeed, RFRA contains an express provision which incorporates the prior Federal case law contemplating a "sensible balance" between religious liberty and competing governmental interests.  See 42 U.S.C. §2000bb(a)(5) ("the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.")  Plaintiffs' position – and its necessary consequence of the imposition of plaintiffs' religious views on others – clearly does not strike a "sensible balance" between religious liberty and the government's compelling interests in this case.  See Hobby Lobby, 537 U.S. at __, 134 S. Ct. at 2786-87 (Kennedy, J., concurring) ("[N]o person may be restricted or demeaned by government in exercising his or her religion. Yet neither may that same exercise unduly restrict other persons, such

91

as employees, in protecting their own interests, interests the law deems

compelling.").

TJOFLAT, Circuit Judge, dissenting:

I diverge from the majority on the question of whether the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, shields Eternal Word Television Network and the Archdiocese of Atlanta, the Diocese of Savannah, and their related schools and charities (the "Dioceses") from the Government's efforts to force them to participate in a complicated regulatory scheme. Doing so, these parties sincerely believe, would make them complicit in violating the sanctity of human life. As I understand RFRA's plain meaning and the controlling precedent, on full display in the Supreme Court's decision in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014), the answer should be straightforward. Under RFRA's demanding scrutiny, the Government cannot put religious believers to the choice of abandoning the commands of their faith or paying massive penalties unless it can show that it has no other way of achieving a compelling interest. Just as in *Hobby Lobby*, the Government has failed to make this showing. We are therefore bound to grant Eternal Word Television Network and the Dioceses the relief they seek.

"Great cases, like hard cases, make bad law." *N. Sec. Co. v. United States*, 193 U.S. 197, 364, 24 S. Ct. 436, 468, 48 L. Ed. 679 (1904) (Holmes, J., dissenting). In such circumstances, practical concerns "exercise a kind of hydraulic pressure" under which "even well settled principles of law will bend" as

93

a result of "some accident of immediate overwhelming interest." *Id.* at 364, 401, 24 S. Ct. at 468. In the background of this litigation rage many competing interests: What sort of legal regime would best preserve the American ideal of religious liberty? How can we most effectively expand healthcare access? When and where should the interests of society trump those of the individual? Who will be left holding the check for any newly minted social-welfare programs?

It is Congress's responsibility—not the prerogative of courts—to balance these interests. And Congress made clear in RFRA how that balance is to be struck: the freedom of religious exercise is to be jealously guarded by subjecting, across the board, Congress's own actions to the most rigorous scrutiny. Under that scrutiny, the Government's attempt here to burden Eternal Word Television Network and the Dioceses' religious exercise must give way. Concluding otherwise, the majority makes bad law. For that reason, I dissent.

## I.

The devil, as they say, is in the details. Nowhere does this adage ring truer than in the administrative morass of the so-called "accommodation," the regulatory mechanism by which religiously objecting employers can affirmatively opt out of the Affordable Care Act's so-called "contraceptive mandate." The resolution of this case turns on the exact functioning of an evolving set of overlapping and intricate regulations promulgated by three Executive-branch agencies. These

94

regulations overlay a particularly unsettled and murky region of the generally unsettled and murky landscape of federal healthcare regulation. Therefore, it is critical to get the details right. And they are devilish indeed.

A.

Under the Patient Protection and Affordable Care Act of 2010 ("the ACA"), covered employers, as part of their "[s]hared responsibility" for their employees' healthcare needs, are required to provide qualifying employees with health plans that meet certain standards of "minimum essential coverage." 26 U.S.C. §§ 4980H(a), 5000A(f)(2). Covered employers who fail to do so have to pay a "tax"[1] of $100 per day for each affected employee. *Id.* § 4980D(a)–(b). For continued "noncompliance" after receiving a "notice of examination," employers are subject to a minimum penalty in the amount of $2,500 or $15,000 per affected employee, depending on whether the violations "are more than de minimis." *Id.* § 4980D(b)(3).

Included in the ACA's definition of "minimum essential coverage" are a number of preventive healthcare services. Relevant here is the requirement to provide "with respect to women, such additional preventive care and screenings … as provided for in comprehensive guidelines supported by the Health Resources

---

[1] It is ironic that the ACA refers to an annual penalty for noncompliance of $36,500 per employee as a "tax." *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. __, __, 132 S. Ct. 2566, 2593–2600, 183 L. Ed. 2d 450 (2012).

and Services Administration."  42 U.S.C. § 300gg-13(4).  To develop these guidelines, the Health Resources and Services Administration, a subpart of the Department of Health and Human Services, sought recommendations from the Institute of Medicine, a division of the National Academies of Sciences.  The Institute of Medicine's recommendations[2] were ultimately adopted in identical regulations promulgated by the Department of Treasury, the Department of Labor, and the Department of Health and Human Services.  *See* 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv).[3]  As a result, nonexempt employers are responsible for providing their plan beneficiaries with coverage for "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *Women's Preventive Services Guidelines*, U.S. Dep't of Health and Human Servs.,

---

[2] The Institute of Medicine's recommendations were laid out in its report *Clinical Preventive Services for Women:  Closing the Gaps*, which was released on July 19, 2011.  Like much of the ACA, that report and the process used to generate it sparked significant controversy, prompting public backlash and a dissent from one of the committee members.  Inst. of Med., *Clinical Preventive Services for Women:  Closing the Gaps* Appendix D at 231–35 (2011) (Anthony Lo Sasso, dissenting); *see also Grace Sch. v. Burwell*, 801 F.3d 788, 815–22 (7th Cir. 2015) (Manion, J., dissenting); 77 Fed. Reg. 8725, 8725–26 (Feb. 15, 2012); Helen M. Alvaré, *No Compelling Interest:  The "Birth Control" Mandate and Religious Freedom*, 58 Vill. L. Rev. 379, 391–431 (2013).  Because I assume that the Government has a compelling interest in providing the preventive services at issue in this case, I pass no judgment on the Institute of Medicine's report or its contents.

[3] As in the majority's opinion, for convenience when discussing the Departments' regulations I will cite only those of the Department of Health and Human Services unless otherwise indicated.

96

Health Res. and Servs. Admin., http://hrsa.gov/womensguidelines/ (last visited

Feb. 10, 2016).

These regulations, collectively known as the "contraceptive mandate," did

not apply as enacted to several categories of employers.  As is true generally of the

ACA, the contraceptive mandate does not cover employers with less than fifty full-

time employees.  *See* 26 U.S.C. § 4890H(a), (c)(2).  These employers are thus

under no obligation to provide any health plan at all.  Similarly, employers who

maintain "grandfathered health plans"—health plans that have not undergone

specified changes in the way they operated before March 23, 2010, *see* 75 Fed.

Reg. 34538, 34540–41—are specifically exempted from the contraceptive

mandate.  42 U.S.C. § 18011(a), (e).  Other changes instituted by the ACA do

apply to grandfathered health plans, including extensions of dependent coverage

for adult children under the age of twenty-six and prohibitions on excessive

waiting periods, lifetime benefits limits, and rescissions of coverage.  *Id.*

§ 18011(a)(4)(A)(i)–(iv).  The ACA does not include a sunset provision for

grandfathered health plans, which can continue their exempt status indefinitely.[4]

---

[4] The Government does predict that grandfathered health plans will be phased out over
time as part of a planned "transition period" designed "to avoid undue disruption."  It is
ultimately an empirical question how many grandfathered plans are currently in effect and how
many will persist in the future.  The record developed in this case, as in so many other respects,
betrays no answer.

Conscious of the bind in which the contraceptive mandate would place certain employers with religious objections, the Departments promulgated a series of further regulations to exempt these employers as well.[5]  What emerged from several years of rulemaking were two distinct regimes for employers with religious objections:  one for "religious employers" and another for "eligible organizations." 45 C.F.R. § 147.131(a), (b).  "Religious employers" are defined, by reference to the Internal Revenue Code, as "churches, their integrated auxiliaries, and conventions or associations of churches" and any "nonprofit entit[ies]" engaged in "the exclusively religious activities of any religious order."  *Id.* § 147.131(a); 26 U.S.C. § 6033(a)(3)(A)(i), (iii).[6]  Employers who object to the contraceptive mandate but are not considered "religious employers" can still qualify as "eligible organizations" if they meet the following requirements:

> (1)  The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

---

[5] The development of the current iteration of the contraceptive mandate—which has changed multiple times since these suits was first brought, though not in ways that materially alter the RFRA inquiry—has been largely defined by how to treat religiously objecting employers, inspiring hundreds of thousands of comments from interested stakeholders. *See* 75 Fed. Reg. 41726, 41726–56 (July 19, 2010); 77 Fed. Reg. 8725, 8725–29 (Feb. 15, 2012); 77 Fed. Reg. 16501, 16501–08 (Mar. 21, 2012); 78 Fed. Reg. 8456, 8456–72 (Feb. 6, 2013); 78 Fed. Reg. 39870, 39870–92 (July 2, 2013); 79 Fed. Reg. 51092, 51092–98 (Aug. 27, 2014); 79 Fed. Reg. 51118, 51118–25 (Aug. 27, 2014); 80 Fed. Reg. 41318, 41318–41 (July 14, 2015).

[6] As the term "church" is hardly self-defining, the IRS uses a fourteen-factor test to determine which organizations make the cut. *See* Internal Revenue Serv., *Pub. 1828:  Tax Guide for Churches & Religious Organizations* 33 (2015), *available at* https://www.irs.gov/pub/irs-pdf/p1828.pdf.

(2)     (i)  The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or

(ii)  The organization is organized and operates as a closely held for-profit entity … that … objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.

(3)  The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described [elsewhere in the regulations]…

45 C.F.R. § 147.131.[7]

---

[7] The current version of § 147.131 took effect on September 14, 2015.  In response to the Supreme Court's decisions in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) and *Wheaton College v. Burwell*, 573 U.S. __, 134 S. Ct. 2806, 189 L. Ed. 2d 856 (2014), § 147.131 now extends to cover qualifying "closely held for-profit entit[ies]" in addition to religious nonprofits, and expands the available methods of opting out of the contraceptive mandate.  *Compare* 45 C.F.R. § 147.131, *with* 45 C.F.R. § 147.131 (effective Aug. 27, 2014 to Sept. 13, 2015), *and* 45 C.F.R. § 147.131 (effective Aug. 1, 2013 to Aug. 26, 2014). The relevant portion of § 147.131 now provides in full:
(b) Eligible organizations. An eligible organization is an organization that meets   the criteria of paragraphs (b)(1) through (3) of this section.
(1) The organization opposes providing coverage for some or all of any contraceptive items or services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
(2)     (i) The organization is organized and operates as a nonprofit entity and holds itself out as a religious organization; or
(ii) The organization is organized and operates as a closely held for-profit entity, as defined in paragraph (b)(4) of this section, and the organization's highest governing body (such as its board of directors, board of trustees, or owners, if managed directly by its owners) has adopted a resolution or similar action, under the organization's applicable rules of governance and consistent with state law, establishing that it objects to covering some or all of the contraceptive services on account of the owners' sincerely held religious beliefs.
(3) The organization must self-certify in the form and manner specified by the Secretary of Labor or provide notice to the Secretary of Health and Human Services as described in paragraph (c) of this section. The organization must make such self-certification or notice available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification or notice must be executed by a person

Religious employers' and eligible organizations' bids to remove themselves from the contraceptive mandate fare differently.  Religious employers are simply exempt; they are not required to participate, directly or indirectly, in providing access to contraceptive coverage to their female employees and beneficiaries, whether or not these women share their employers' beliefs.  45 C.F.R. § 147.131(a).  Eligible organizations, in contrast, are required to affirmatively opt out of providing contraceptive coverage, if they wish to do so, by complying with a further series of regulations known as "the accommodation."  *Id.* § 147.131(c).

How the accommodation functions turns on the eligible organization's type of health plan.  Broadly speaking, employer-sponsored health plans come in two types:  insured plans and self-insured plans.  Under an insured plan, the employer enters into a contract with an insurer.  The insurer, in exchange for up-front premiums, becomes responsible for administering the plan and paying out claims.  Under a self-insured plan, the employer remains responsible for paying its employees' claims itself; in essence, the employer serves as its own insurer.  For employers with self-insured plans, it is a common practice to contract with a third-party administrator—which may also be in the business of providing insured plans—to administer the self-insured plan, though the employer continues to bear

authorized to make the certification or notice on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of ERISA.

the cost of paying claims.[8]  Eligible organizations that maintain their own self-insured plans without a third-party administrator are, like religious employers, exempt from the contraceptive mandate altogether.

Eligible organizations may, in line with the regulations currently in force, avail themselves of the accommodation in one of two ways.[9]  The first option is to send a "self-certification" form, Employee Benefits Security Administration Form 700 ("Form 700"), to the eligible organization's insurer, if the organization has an insured plan, or to the organization's third-party administrator, if the organization has a self-insured plan.  45 C.F.R. § 147.131(b)(3), (c)(1).  Form 700 requires eligible organizations to identify themselves as qualifying for the accommodation; list the name, title, and contact information of the person authorized to make that certification; and sign and date the form.[10]  The second option is to send to the Secretary of Health and Human Services less-formal notice of the eligible organization's intent to opt out.  That notice must include "the name of the eligible organization and the basis on which it qualifies for an accommodation," notice of

---

[8] For example, Eternal Word Television Network has a self-insured health plan for which Blue Cross Blue Shield of Alabama serves as third-party administrator.  The Dioceses collectively maintain three self-insured health plans, for all of which Meritain Health serves as third-party administrator.  Though Blue Cross Blue Shield of Alabama and Meritain Health may separately offer insured plans, they are not responsible for paying the claims of Eternal Word Television Network's and the Dioceses' beneficiaries.

[9] In the pre–*Wheaton College* iteration of the contraceptive mandate, there was only one way to opt out under the accommodation:  submitting Employee Benefits Security Administration Form 700 to the relevant insurer or third-party administrator.  *See infra* n.11.

[10] A copy of Form 700 is appended to the majority's opinion.

101

its objection to the contraceptive mandate "based on [the eligible organization's] sincerely held religious beliefs," the name and type of the eligible organization's health plan, and the identity and contact information of the eligible organization's insurer or third-party administrator.  *Id.* § 147.131(c)(1)(ii).

Under the first option provided for in the accommodation, whereby Form 700 is sent directly to an eligible organization's insurer or third-party administrator, the recipient insurer or third-party administrator becomes responsible for establishing separate contraceptive coverage for the eligible organization's female employees and plan beneficiaries.  The insurer or third-party administrator must, upon receipt of the eligible organization's Form 700, "[e]xpressly exclude contraceptive coverage" from the eligible organization's plan and "[p]rovide separate payments for any contraceptive services required to be covered" pursuant to the contraceptive mandate.  *Id.* § 147.131(c)(2)(i)(A)–(B). Among other requirements, the insurer or third-party administrator must also "segregate premium revenue … from the monies used to provide payments for contraceptive services" and is forbidden from "impos[ing] any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impos[ing] any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries."  *Id.* § 147.131(c)(2)(ii).  And the insurer or third-party administrator

must provide to plan members and beneficiaries written notice outlining how the accommodation works and "specify[ing] that the eligible organization does not administer or fund contraceptive benefits."  *See id.* § 147.131(d) (proposing suggested language for this notice).

Under the second option provided for in the accommodation, whereby less-formal notice is sent instead to the Secretary of Health and Human Services, the Secretary is then tasked with alerting the eligible organization's insurer or third-party administrator.  The Department of Health and Human Services will "send a separate notification" to the insurer relaying that the eligible organization's notice was received and "describing the [insurer's or third-party administrator's] obligations."  45 C.F.R. § 147.131(c)(1)(ii).  The insurer's or third-party administrator's obligations to provide separate coverage pursuant to the contraceptive mandate are identical whether it is alerted to the eligible organization's objections directly by Form 700 or indirectly by the Government.[11]

---

[11] The reason that eligible organizations are given two similar-seeming options for opting out of the contraceptive mandate stems from the Supreme Court's decision in *Wheaton College v. Burwell*, 573 U.S. __, 134 S. Ct. 2806, 189 L. Ed. 2d 856 (2014).  In *Wheaton College*, the Supreme Court enjoined enforcement of the contraceptive mandate against an eligible organization that sent written notice to the Government but objected, based on the organization's religious beliefs, to sending Form 700 to its insurer and third-party administrator.  *Id.* at __, 134 S. Ct. 2807.  The Court did not address the situation presented here where an eligible organization objects, on religious grounds, both to completing Form 700 and to providing less-formal notice to the Secretary of Health and Human Services.

103

The regulations require eligible organizations to affirmatively opt out of the contraceptive mandate because doing so enables the Government to require the eligible organizations' insurers and third-party administrators to provide contraceptive coverage. For eligible organizations with insured plans,[12] opting out under the accommodation notifies the insurers of their obligations to provide contraceptive coverage. 45 C.F.R. § 147.131(c)(2)(i). For eligible organizations with self-insured plans that contract with a third-party administrator,[13] opting out of the contraceptive mandate under the accommodation makes the third-party administrator "the plan administrator" for purposes of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, under regulations promulgated by the Department of Labor. 29 C.F.R. § 2510.3-16(b). If the eligible organization submits Form 700, that submission "shall be treated as a designation of the third party administrator as the plan administrator." *Id.* If the eligible organization instead provides less-formal notice to the Secretary of Health and Human Services, "the Department of Labor, working with the Department of Health and Human Services, shall … provide notification … that such third party administrator shall be the plan administrator" under ERISA. *Id.* Once a third-party administrator becomes a "plan administrator" under ERISA, the relevant

---

[12] Because this case does not involve eligible organizations with insured plans, I pass no judgment on the accommodation in that context.

[13] As mentioned above, eligible organizations that administer their own self-insured plans are not subject to the contraceptive mandate under the regulations.

104

administrative agencies gain the regulatory authority to require the third-party administrator to provide contraceptive coverage.[14] *Id.* § 2510.3-16(c).

The Government's regulatory authority to require third-party administrators of self-insured plans to provide contraceptive coverage is limited. A third-party administrator may always decline to "agree[] to enter into or remain in a contractual relationship with the eligible organization."[15] 26 C.F.R. § 54.9815-2713A(b)(2). Only if it accepts the terms of the regulations does a third-party administrator incur the obligation "to provide or arrange payments for contraceptive services." *Id.* § 54.9815-2713A(d). If a third-party administrator agrees to provide the contraceptive coverage, the costs it incurs to do so will be reimbursed from "Federally-facilitated Exchange" user fees, which are fees

---

[14] Under ERISA, a third-party administrator that is neither the "plan sponsor" nor specifically designated as such can be considered the "plan administrator" only "as the Secretary [of Labor] may by regulation prescribe." 29 U.S.C. § 1002(16)(A)(iii). The Government contends that, as currently written, the ACA's implementing regulations also allow it to independently enforce the contraceptive mandate against third-party administrators of self-insured plans without any further action from the eligible organization. The truth of this contention is far from certain. *See ante* at 44–45 & nn.30–31; *Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs.*, 801 F.3d 927, 935 n.8 (8th Cir. 2015) (collecting cases contrary to the Government's position). In any event, I decline to pass judgment on this question because its resolution is unnecessary to decide this case.

[15] If a third-party administrator declines to provide contraceptive coverage, eligible organizations with self-insured plans must select another willing third-party administrator, administer its own health plan, or become subject to the monetary penalties discussed above.

105

imposed on insurers offering health plans on exchanges established by the

Government under the ACA.[16]  *See* 80 Fed. Reg. at 41328.

## B.

Inextricably intertwined with these evolving regulations is a series of cases

challenging the various iterations of the contraceptive mandate under the Religious

Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*.  RFRA provides

that the federal government[17] "may substantially burden a person's exercise of

religion" only if it does so "in furtherance of a compelling governmental interest"

and the burden it imposes is "the least restrictive means of furthering that

compelling governmental interest."  *Id.* § 2000bb-1(b).

In 1993, Congress enacted RFRA in response to the Supreme Court's path-

breaking approach to the First Amendment's Free Exercise Clause taken in

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494

---

[16] Specifically, the regulations contemplate "adjustments" to the third-party administrator's own user fees, if the third-party administrator also offers health plans on a Federally-facilitated Exchange, or the user fees of another participating insurer that the third-party administrator contracts with to receive reimbursement.  *See* 80 Fed. Reg. at 41328.  Third-party administrators are to be reimbursed for the "total dollar amount of the payments for contraceptive services" and an "allowance for administrative costs and margin" of "no less than 10 percent" for the amount spent on contraceptive services.  45 C.F.R. § 156.50(d)(3)(i), (ii).  The Government does not address how reimbursement will be made, if at all, should these user fees prove insufficient.  *Cf. King v. Burwell*, 576 U.S. __, __, 135 S. Ct. 2480, 2487, 192 L. Ed. 2d 483 (2015) (noting that the ACA contemplates that each state will create its own exchange).

[17] RFRA originally applied to the actions of state governments as well, but the Supreme Court held that extending RFRA's mandate to the states exceeded Congress's powers under § 5 of the Fourteenth Amendment.  *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997).

U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) (holding that neutral laws of general applicability do not burden free exercise whether or not they are supported by a compelling interest).  Congress declared that the standard of strict scrutiny RFRA imposes creates "a workable test for striking sensible balances between religious liberty and competing prior governmental interests."  42 U.S.C. § 2000bb(a)(5).  RFRA's stated purposes included "restor[ing] the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)" and "provid[ing] a claim or defense to persons whose religious exercise is substantially burdened by government."  *Id.* § 2000bb(b)(1), (2).  To the extent that it imposes a least-restrictive-means requirement not present in *Sherbert* or *Yoder*, however, RFRA "provide[s] even broader protection for religious liberty than was available under those decisions." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, __ n.3, 134 S. Ct. 2751, 2761 n.3, 189 L. Ed. 2d 675 (2014).

Following the enactment of the ACA and the promulgation of the contraceptive mandate, a diverse set of employers brought suit to avoid providing what they viewed as objectionable contraceptive coverage.[18]  The Supreme Court

---

[18] Though the bulk of this litigation has been brought under RFRA, at least one non-religious employer has challenged the contraceptive mandate under the Fifth Amendment.  *See March for Life v. Burwell*, No. 14-cv-1149(RJL), 2015 WL 5139099 (D.D.C. Aug. 31, 2015) (concluding that the contraceptive mandate violates equal-protection principles because it lacks a rational basis for discriminating between religious and non-religious objectors).  Because this

107

first encountered the contraceptive mandate in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014).[19]  The Court held in *Hobby Lobby* that enforcing the contraceptive mandate against a closely held for-profit company that had religious objections to providing contraceptive coverage would violate RFRA.  *Id.* at __, 134 S. Ct. at 2785.  The Court began by determining that, as a matter of statutory interpretation, RFRA covers certain for-profit companies because the term "person" was not limited only to natural persons.  *Id.* at __, 134 S. Ct. at 2767–75.  Moving to RFRA's threshold inquiry, the Court "ha[d] little trouble concluding" that the contraceptive mandate imposes a substantial burden on religious exercise.  *Id.* at __, 134 S. Ct. at 2775.  The *Hobby Lobby* plaintiffs had an uncontested "sincere religious belief that life begins at conception" and understood that their belief would be violated if they were required to "provid[e] health insurance that covers methods of birth control" that "may result in the destruction of an embryo."  *Id.*  By forcing them to choose between violating their deeply held convictions and "pay[ing] an enormous sum of money," the contraceptive mandate "clearly imposes a substantial burden on those beliefs."  *Id.* at __, 134 S. Ct. at 2779.

case involves only employers with religious objections and is resolved by RFRA's clear dictates, I decline to address the constitutional propriety of applying the contraceptive mandate to non-religious objectors.

[19] Justice Alito wrote the majority opinion in *Hobby Lobby*, joined by Chief Justice Roberts and Justices Scalia and Thomas.  Justice Kennedy concurred.  Justice Ginsburg dissented, joined in full by Justice Sotomayor and in relevant part by Justices Breyer and Kagan.

The Court specifically and emphatically rejected any argument that the participation of religious objectors, by paying for contraceptive coverage, is "simply too attenuated" from the objectionable outcome, the destruction of embryos, to constitute a burden on religious exercise. *Id.* at __, 134 S. Ct. at 2777. Such an argument, which "implicates a difficult and important question of religion and moral philosophy," would "in effect tell the plaintiffs that their beliefs are flawed"—and defining the scope of religious belief is a dangerous line-drawing inquiry "federal courts have no business addressing." *See id.* at __, 134 S. Ct. at 2778 ("Instead, our 'narrow function … in this context is to determine' whether the line drawn reflects 'an honest conviction'" (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716, 101 S. Ct. 1425, 1431, 67 L. Ed. 2d 624 (1981))). Moreover, the Court noted, if the contraceptive mandate's burden were not substantial, it would "be hard to understand" and "not easy to square" with the exemptions carved out for qualifying "religious employers" facing "exactly the same" burden. *Id.* at __ n.33, 134 S. Ct. at 2777 n.33.

The Court next declined to address whether the contraceptive mandate furthered a compelling interest because, even if it did, the contraceptive mandate was not the least restrictive means of doing so. *Id.* at __, 134 S. Ct. at 2779–80. The Court identified several less-restrictive alternatives that the Government could have used to achieve the assumed compelling interest, holding that the

109

contraceptive mandate foundered under RFRA's "exceptionally demanding" standard. *Id.* at __, 134 S. Ct. at 2780. The "most straightforward" alternative "would be for the Government to assume the cost" of contraceptive coverage. *Id.* at __, 134 S. Ct. at 2780. In response to the Government's contrary position, the Court observed that "it is hard to understand [the] argument that [the Government] cannot be required under RFRA to pay anything" for "a Government interest of the highest order." *Id.* at __, 134 S. Ct. at 2781.[20] The Court also strongly suggested that the Government's direct provision of contraceptive coverage would still be a less-restrictive alternative if the Government were required to create "an entirely new program" rather than "modif[y] an existing program (which RFRA surely allows)." *Id.*

In its analysis the Court decided it "need not rely on the option of a new, government-funded program" to identify a less-restrictive alternative because the regulations already provided one: the then-existing version of the accommodation for employers with religious objections. *Id.* at __, 134 S. Ct. at 2781–82. The for-

---

[20] Requiring the Government to, at times, spend additional monies to avoid imposing substantial burdens on the free exercise of religious objectors would accord with RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, 2000cc-1. *See id.* § 2000cc-3(c) ("[T]his chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."). Congress enacted RLUIPA pursuant to the Spending and Commerce Clauses after the Supreme Court in *City of Boerne* held that RFRA could not be applied to the actions of state governments under § 5 of the Fourteenth Amendment. *See supra* note 17. The standard of RLUIPA mirrors that of RFRA and applies in two contexts: land-use regulation and the religious exercise of institutionalized persons.

110

profit *Hobby Lobby* plaintiffs did not object to the accommodation itself, so granting them the option for a third party to provide their female employees' contraceptive coverage "serves [the Government's] stated interests equally well." *Id.* at __, 134 S. Ct. at 2781–82.  Though derided as "'noncommittal'" by the dissent for doing so, the Court expressly declined to rule on "whether an approach of this type complies with RFRA for purposes of all religious claims."  *Id.* at __ & n.40, 134 S. Ct. at 2782 & n.40.

Three days after it decided *Hobby Lobby*, the Supreme Court again ruled on the contraceptive mandate in *Wheaton College v. Burwell*, 573 U.S. __, 134 S. Ct. 2806, 189 L. Ed. 2d 856 (2014).[21]  In *Wheaton College*, the Court issued an order enjoining the Secretary of Health and Human Services, "pending final disposition of appellate review," from enforcing the contraceptive mandate against an employer that submits "in writing that it is a non-profit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services."  *Id.* at __, 134 S. Ct. at 2807.  The parties disputed whether the obligation to provide contraceptive coverage was "dependent" on submitting Form 700 to an insurer or third-party administrator.  *Id.*  The Court concluded in its two-page order that, because notice had already been given to the Government, the

---

[21] Chief Justice Roberts and Justices Alito, Thomas, Kennedy, and Breyer joined the Court's decision in *Wheaton College*.  Justice Scalia concurred without issuing a separate opinion.  Justice Sotomayor dissented, joined by Justices Ginsburg and Kagan.

111

Government "relying on this notice" could "facilitate the provision of full contraceptive coverage under the [ACA]." *Id.* The Court ended its order by noting that it "should not be construed as an expression of the Court's views on the merits." *Id.*

After *Hobby Lobby* and *Wheaton College*, the federal courts were inundated with cases posing the question presented here: whether RFRA provides relief to employers with religious objections to the accommodation itself. Our sister circuits are deeply divided. Like the majority, most circuits have concluded that, though RFRA requires deference to adherents' sincerely held religious beliefs, "an objective inquiry" to determine whether a law presents a substantial burden reveals that the accommodation does not impose a substantial burden on religious exercise.[22] *Ante* at 33–41; *see also Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 216–18 (2d Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health and Human Servs.*, 778 F.3d 422, 435–40 (3d Cir. 2015), *cert. granted sub nom. Zubik v. Burwell*, 83 U.S.L.W. 3894 (U.S. Nov. 6, 2015) (No. 14-1418) *and cert. granted*, 84 U.S.L.W. 3096 (U.S. Nov. 6, 2015) (No. 15-191); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 456–58 (5th Cir. 2015), *cert. granted*, 84 U.S.L.W. 3050 (U.S. Nov. 6, 2015) (No. 15-35); *Mich. Catholic Conference & Catholic*

---

[22] Lumping together these decisions in this manner necessarily misses some of their nuance. Again, this case is limited to eligible organizations with self-insured health plans overseen by third-party administrators that object, on religious grounds, to the accommodation.

112

*Family Servs. v. Burwell*, Nos. 13-2723, 13-6640, 2015 WL 4979692, at \*7–8 (6th Cir. Aug. 21, 2015); *Grace Sch. v. Burwell*, 801 F.3d 788, 803–05 (7th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 614–19 (7th Cir. 2015); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1176–77 (10th Cir. 2015), *cert. granted sub nom. S. Nazarene Univ. v. Burwell*, 84 U.S.L.W. 3061 (U.S. Nov. 6, 2015) (No. 15-119) *and cert. granted*, 84 U.S.L.W. 3056 (U.S. Nov. 6, 2015) (No. 15-105); *Priests for Life v. U.S. Dep't of Health and Human Servs.*, 772 F.3d 229, 246–49 (D.C. Cir. 2014), *cert. granted sub nom. Roman Catholic Archbishop v. Burwell*, 83 U.S.L.W. 3936 (U.S. Nov. 6, 2015) (No. 14-1505) *and cert. granted*, 83 U.S.L.W. 3918 (U.S. Nov. 6, 2015) (No. 14-1453).  The Eighth Circuit and a number of dissenting judges have concluded otherwise, determining that the accommodation substantially burdens religious exercise.  *See Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs.*, 801 F.3d 927, 941–43 (8th Cir. 2015), *cert. granted*, 84 U.S.LW. 3350 (U.S. Dec. 15, 2015 ) (No. 15-775); *E. Tex. Baptist Univ. v. Burwell*, Nos. 14-20112, 14-10241, 14-40212, 2015 WL 5773560, at \*2–3 (5th Cir. Sept. 30, 2015) (Jones, J., dissenting from denial of rehearing en banc); *Grace Sch.*, 801 F.3d at 810–15 (Manion, J., dissenting); *Univ. of Notre Dame*, 786 F.3d at 627–29 (Flaum, J., dissenting); *Little Sisters of the Poor*, 794 F.3d at 1208–10 (Baldock, J., dissenting in part); *Little Sisters of the Poor Home for the Aged v. Burwell*, 799 F.3d 1315, 1316–18 (10th Cir. 2015)

(Hartz, J., dissenting from denial of rehearing en banc); *Eternal Word  Television Network, Inc. v. Sec'y, U.S. Dep't of Health and Human Servs.*, 756 F.3d 1339, 1344–48 (11th Cir. 2014) (William Pryor, J., specially concurring in order granting injunction pending appeal); *Priests for Life v. U.S. Dep't of Health and Human Servs.*, Nos. 13-5368, 13-5371, 14-5021, 2015 WL 5692512, at \*6–8 (D.C. Cir. May 20, 2015) (Brown, J., dissenting from denial of rehearing en banc); *Priests for Life*, 2015 WL 5692512, at \*14–17 (Kavanaugh, J., dissenting from denial of rehearing en banc).

## C.

To summarize, when Congress enacted the ACA it ceded broad authority to three Executive-branch administrative agencies to promulgate rules governing the availability of women's preventive health services in employer-sponsored health plans. The agencies ultimately determined that the Government had a compelling interest in providing women with cost-free access to a wide range of contraceptive services. In accordance with that determination, the agencies, through threat of large monetary penalties, mandated that certain employers must provide contraceptive coverage to their female employees. Though Congress had already exempted some types of employers—those with fewer than fifty employees and those with grandfathered health plans—the agencies decided that another group of

114

employers should be exempt too:  churches and church-affiliated organizations, as defined by already-existing definitions in the Internal Revenue Code.

The agencies exempted churches and church-affiliated organizations from the contraceptive mandate because the agencies understood that the contraceptive mandate would impose a substantial burden on many of these organizations' religious exercise.  As a result, churches and church-affiliated organizations may choose what contraceptive coverage, if any, will be available in their female employees' health plans.  No such exemption, however, was thought necessary for other organizations with similar religious objections, whether for-profit or nonprofit.  After much public outcry and litigation, the agencies changed course. At first, the agencies began offering an exemption-like option to certain nonprofits with religious objections.  In response to the Supreme Court's decision in *Hobby Lobby*, the agencies extended the same to for-profit religious objectors as well.

But the exemption-like option—the accommodation—did not truly exempt qualifying employers.  Rather, it required qualifying employers to affirmatively opt out of providing contraceptive coverage, shifting the obligation to provide the required contraceptive coverage to the employers' insurer or third-party administrator.  Originally, qualifying employers had to opt out by sending Form 700 to the insurer or third-party administrator responsible for the employers' health plans, alerting the insurer or third-party administrator to its new obligations.  After

115

the Supreme Court's order in *Wheaton College*, the agencies also made available an option of providing less-formal notice to the Secretary of Health and Human Services. Under this option, the notice is rerouted to the insurer or third-party administrator, in lieu of the employer submitting Form 700 directly.

For employers that run self-insured health plans in conjunction with a third-party administrator and are eligible for the accommodation, opting out of the contraceptive mandate has the effect of designating the employers' third-party administrators as "plan administrators" under ERISA. Once so designated, the agencies can require a third-party administrator to provide contraceptive coverage. Absent any affirmative action from the employer, third-party administrators remain outside of ERISA's reach. Likewise outside of ERISA's reach, and thus effectively exempt from the contraceptive mandate, are employers that run self-insured health plans without a third-party administrator.

As a result, there are four discrete options facing employers like Eternal Word Television Network and the Dioceses, which operate self-insured plans and do not meet the Internal Revenue Code's definition for churches or church-affiliated organizations but nonetheless have religious objections to providing contraceptive coverage. First, these employers can provide the objectionable coverage in violation of their beliefs. Second, these employers can comply with the accommodation and affirmatively opt out of the contraceptive mandate,

116

shifting the obligation to provide the required coverage to their insurer or third-party administrator, also in violation of their beliefs. Third, these employers can drop their third-party administrators and assume the costs and responsibilities of running their own health plans. Fourth, these employers can do nothing and thereby become liable for annual fines of thousands of dollars per employee.

This case requires two determinations. First, does the regulatory scheme discussed above impose a substantial burden on the religious exercise of Eternal Word Television Network and the Dioceses, which believe that opting out under the accommodation would violate the sanctity of human life? If so, does the regulatory scheme nonetheless survive RFRA's demanding standard of strict scrutiny? Because I conclude that the answers to these questions are yes and no, while the majority says no and yes, I dissent.

## II.

The threshold inquiry under RFRA requires a showing that the Government has "substantially burden[ed]" the plaintiff's "exercise of religion." 42 U.S.C. § 2000bb-1. First, a RFRA plaintiff must identify religious exercise that the Government is burdening. The allegedly burdened exercise "must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 574

117

U.S. __, __, 135 S. Ct. 853, 862, 190 L. Ed. 2d 747 (2015).[23]  When determining

the content of a religious belief, including how and to what extent its attendant

exercise may be burdened, we defer to the plaintiff's understanding of what his

faith requires of him because "[c]ourts are not arbiters of scriptural interpretation."

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716, 101 S. Ct. 1425,

1431, 67 L. Ed. 2d 624 (1981).  So long as a religious adherent has drawn a line

based on "an honest conviction," "it is not for us to say that the line he drew was

an unreasonable one."  *Id.* at 715–16, 101 S. Ct. at 1430–31.

Next, we must determine whether, as an objective matter, the identified

burden on religious exercise is substantial.  The existence of a substantial burden,

which "can result from pressure that tends to force adherents to forego religious

precepts or from pressure that mandates religious conduct," turns on whether the

Government's actions coerce a religious adherent to affirmatively violate his

beliefs.  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th

Cir. 2004).  To be substantial, a burden must be "akin to significant pressure which

directly coerces the religious adherent to conform his or her behavior accordingly"

and must be more than "an inconvenience on religious exercise."  *Id.*  For example,

a zoning ordinance that forces members of an Orthodox Jewish congregation to

---

[23] Though *Hobbs* involved a claim brought under RLUIPA rather than RFRA, both statutes impose the same standard for substantial burdens of religious exercise. *See, e.g.*, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).

"walk[] a few extra blocks" to attend services on the Sabbath is not a substantial burden when there is no "religious significance" as to a particular synagogue site, though "walking may be burdensome." *Id.* at 1221, 1227–28.  In contrast, if the Government puts a religious adherent to the "choice" of incurring a "serious" penalty or "'engag[ing] in conduct that seriously violates [his] religious beliefs,'" then the Government "substantially burdens his religious exercise." *See Hobbs*, 574 U.S. at __, 135 S. Ct. at 862 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, __, 134 S. Ct. 2751, 2775, 189 L. Ed. 2d 675 (2014) (second alteration in the original)). And a burden is no less substantial if the burdened party "is able to engage in other forms of religious exercise," if the exercise in question is not "compelled" by the burdened party's religion, or if the burdened party's belief is "idiosyncratic." *Id.* at __, 135 S. Ct. 862.

Here, it is overwhelmingly clear that the contraceptive mandate imposes on Eternal Word Television Network and the Dioceses a burden that the accommodation does not alleviate.  Eternal Word Television Network and the Dioceses assert a religious belief—which the Government does not contest is sincerely held—that both complying with the contraceptive mandate and opting out under the accommodation, which requires the third-party administrators of their health plans to provide contraceptive coverage, would make them complicit in violating the sanctity of human life.  The Government burdens that belief by

119

requiring Eternal Word Television Network and the Dioceses to affirmatively participate in its regulatory scheme.

And it is equally clear that the burden imposed is substantial. The Government puts Eternal Word Television Network and the Dioceses to the "choice" of either (1) complying with the contraceptive mandate, to which they object on religious grounds; (2) opting out under the accommodation, to which they also object on religious grounds; (3) dropping the third-party administrators of their health plans and becoming de facto insurance companies, incurring substantial costs and diverting the focus of their religiously motivated operations; or (4) incurring millions of dollars in penalties annually.[24]  Besides providing yet another way for the eligible organizations to violate their religious beliefs, the accommodation does nothing to change the Supreme Court's holding in *Hobby Lobby* that the contraceptive mandate "clearly imposes a substantial burden on those beliefs." 573 U.S. at __, 134 S. Ct. at 2779. Eternal Word Television Network and the Dioceses must either violate their beliefs or incur massive

---

[24] Should it fail to comply with the contraceptive mandate, Eternal Word Television Network would face annual penalties of up to $12,775,000 for its 350 full-time employees. *See Eternal Word  Television Network, Inc. v. Sec'y, U.S. Dep't of Health and Human Servs.*, 756 F.3d 1339, 1341–42 (11th Cir. 2014) (William Pryor, J., specially concurring in order granting injunction pending appeal). The Dioceses' three health plans are collectively responsible for almost 2,000 employees and would be subject to roughly $73,000,000 per year. *See Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 1256373, at *2 (N.D. Ga. Mar. 26, 2014); 26 U.S.C. § 4890D(b)(1).

monetary costs.  On its face, such a "choice" is not a choice at all.  Rather, it is a substantial burden on religious exercise.

As I understand it, this straightforward application of RFRA's substantial-burden test should end the matter.  The majority thinks otherwise, reaching the wrong conclusion for two reasons.  First, the majority fails to give proper deference to Eternal Word Television Network and the Dioceses' sincerely held religious beliefs.  Second, the majority mischaracterizes how the contraceptive mandate works by understating the critical role that the accommodation forces employers to play in providing contraceptive coverage.

Before explaining why the majority fails to give RFRA its proper meaning, it is helpful to clarify how our understandings of RFRA's inquiry differ.  Exactly where we differ is highlighted below:

121

| THE MAJORITY'S VIEW OF RFRA | THE CORRECT VIEW OF RFRA |
|---|---|
| Step 1:  Does the plaintiff hold a sincere religious belief?<br>    —*Objective determination*<br><br>What are the contents of that belief?<br>    —*Deference to the plaintiff* | Step 1:  Does the plaintiff hold a sincere religious belief?<br>    —*Objective determination*<br><br>What are the contents of that belief?<br>    —*Deference to the plaintiff* |
| Step 2:  Do the Government's actions *substantially burden* the plaintiff's religious exercise?<br><br><br><br>    —*Objective determination* | Step 2(a):  Do the Government's actions *burden* the plaintiff's religious exercise?<br><br>    —*Deference to the plaintiff* |
| (continued above) | Step 2(b):  If so, is that burden *substantial*?<br><br>    —*Objective determination* |
| Step 3:  Is the Government acting to further a compelling interest?<br><br>    —*Objective determination* | Step 3:  Is the Government acting to further a compelling interest?<br><br>    —*Objective determination* |
| Step 4:  Is the Government's chosen means the least-restrictive alternative of achieving that compelling interest?<br><br>    —*Objective determination* | Step 4:  Is the Government's chosen means the least-restrictive alternative of achieving that compelling interest?<br><br>    —*Objective determination* |

## A.

First, the majority fails to give the proper deference due Eternal Word Television Network and the Dioceses' sincerely held belief that it would violate the sanctity of human life to comply with the Government's regulatory scheme, either directly through the contraceptive mandate or indirectly through the accommodation.  Though the majority purports to defer to these beliefs, its deference is largely illusory.  The majority begins by correctly observing that

122

RFRA's substantial-burden inquiry "involves both subjective and objective dimensions." *Ante* at 34. The majority continues on, also correctly, to observe that "courts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action." *Id.* The majority falters, however, when it concludes that "it is for the courts to determine objectively . . . whether the government has, in fact, put plaintiffs to the choice of violating their religious beliefs . . . or incurring a substantial penalty." *Id.* at 36–37.

Contrary to the majority's position, RFRA *does* require deference to religious adherents' determinations that their sincerely held beliefs are being *burdened*. "The narrow function of a reviewing court in this context" prevents unnecessary and improper judicial intrusion into highly sensitive matters of moral philosophy or theology, *Thomas*, 450 U.S. at 716, 101 S. Ct. at 1431, and this understanding of the substantial-burden standard is confirmed by the Supreme Court's most recent religious-accommodation decisions. S*ee Hobbs*, 574 U.S. at __, 135 S. Ct. at 861–63 (granting an exemption to a prison's grooming policy for a Muslim inmate's proposed "'compromise'" that he be allowed to grow a half-inch-long beard); *Hobby Lobby*, 573 U.S. at __, 134 S. Ct. at 2775–79 (rejecting the argument that "the connection between" providing contraceptive coverage and

123

the "destruction of an embryo[] is simply too attenuated" because this "would in effect tell the plaintiffs their beliefs are flawed.").

The "objective inquiry" under RFRA focuses only on whether that burden is *substantial*. For example, courts must defer to a religious adherent's belief, if it is sincerely held, that dancing is morally wrong.[25] And courts must defer to the religious adherent's understanding that this belief would be burdened if she were required to look upon, even if only for a moment, a single masquerade ball or sock hop. What courts must determine as an objective matter is whether the burden imposed by any pro-dancing Government action is a *substantial* one. Imposing millions of dollars in fines for failing to perform a Government-mandated jitterbug would, obviously, be a substantial burden on religious exercise. In contrast, there would be no *substantial* burden if the Government merely financed public dancefloors or had a hortatory policy of extolling the virtues of dance.[26]

If the substantial-burden test were as the majority believes it to be, federal judges would have to decide whether *the burden itself substantially violated the adherent's beliefs*. That is, the majority would necessarily shift the gaze of its "objective inquiry" to the merits of religious belief. In this Bizarro World, it

---

[25] Many faith traditions proscribe some or all forms dancing, including various denominations of Christianity, Islam, and Judaism.

[26] Indeed, it appears that Congress has contemplated adopting such a measure. *See* H.R. Res. 667, 113th Cong. (2014) (as introduced in the House, July 11, 2014) ("Expressing support for dancing as a form of valuable exercise and artistic expression, and for the designation of July 26, 2014, as National Dance Day.").

124

would be secular courts making ex cathedra pronouncements on whether Muslims are truly put out by requirements to shave their beards, *Hobbs*, 574 U.S. __, 135 S. Ct. 853; *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), whether Seventh-day Adventists are sufficiently deterred from accepting employment by requirements to work on Saturdays, *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), whether Santeria priests could just make do without ritual sacrifice or Ache-infused beads and shells, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993); *Davila v. Gladden*, 777 F.3d 1198 (11th Cir. 2015), and whether the sacramental use of peyote is really that big of a deal to members of the Native American Church, *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). But, of course, the Constitution does not vest in the judiciary the authority to declare winners and losers in matters of faith. And for good reason.

At bottom, the majority's reasoning takes aim at the heart of RFRA itself. Implicit in the majority's rationale is the notion that wily plaintiffs could game the system if religious adherents' beliefs were given the full extent of the deference demanded by RFRA. In tailoring their stated beliefs, these plaintiffs could engage in strategic litigation unhampered, impairing the government's ability to function efficiently. By expanding the limited scope of the objective portion of the

125

substantial-burden inquiry, the majority expressly seeks to avoid "reducing the . . . federal courts to 'rubber stamps.'" *Ante* at 37. Here, despite conceding as the majority must that "the act of opting out plays [some] causal role in the ultimate provision of contraceptive coverage," the majority runs roughshod over the sincerely held religious objections of Eternal Word Television Network and the Dioceses because, in line with the majority's sense of things, the "de minimis burden that the plaintiffs face" resulting from their role as "an incidental cause of contraceptive coverage being provided" does not constitute a substantial burden. *Id.* at 44-45, 47. The majority through a nifty bit of legalistic legerdemain manages to transform the subjective content of religious adherents' sincerely held beliefs into an objective question of federal law, undercutting the very deference to religious exercise it purports to extend.

The majority's not-so-veiled implication that, if given its full effect, RFRA will be refashioned from a shield protecting the faithful into a sword wielded by cynical opportunists is troubling and at odds with RFRA's fundamental respect for the deeply held convictions that guide the daily lives of hundreds of millions of Americans. As an initial matter, whether or not a belief is sincerely held remains an important part of RFRA's substantial-burden inquiry. Courts are not, for example, compelled to entertain challenges from such obvious farces as a

hypothetical "Church of Marijuana and Pepperoni Pizza"[27] or the satirical "Our Lady of Perpetual Exemption."[28]  Separating the faithful sheep from the cynically opportunistic goats is well within our judicial capabilities.

Moreover, to the extent that granting exemptions for religious adherents would impair the government's ability to run programs and administer law efficiently, this is a feature of RFRA, not a bug.  Congress made the clear policy choice that protecting the individual right of free religious exercise outweighed the costs imposed at the expense of administrative efficiency.  And this choice—to preserve individual freedom by fettering the Government's ability to act as expeditiously as possible—is at the core of our foundational notion of limited government.  Permitting demonstrations in public parks, requiring police officers to secure a warrant before searching homes or seizing persons, and committing the Government to provide just compensation if it wishes to take private property all surely hamper the Government's ability to pursue countless other important ends.  These tradeoffs are the cost of liberty.  And how best to balance these enhanced

---

[27] Of course, people can and do sincerely believe that marijuana consumption serves a sacramental purpose.  *See, e.g.*, *Olsen v. Drug Enf't Admin.*, 878 F.2d 1458 (D.C. Cir. 1989).

[28] *See God bless John Oliver:  late-night comedian forms his own church*, The Guardian (Aug. 17, 2015), http://www.theguardian.com/tv-and-radio/2015/aug/17/john-oliver-last-week-tonight-mega-church.

protections against their added costs is exactly the sort of thorny policy decision best left to democratically responsive legislators, not unelected judges.[29]

The majority is hardly alone in its implicit rejection of RFRA's core purpose. Striking the proper balance between the collective needs of society and the individual freedom of religious exercise has been fraught with rancor and sectarian strife since time immemorial. Unsurprisingly then, the oft-embattled RFRA has proven a favorite whipping boy from all sides of the legal academy during its twenty-three-year existence. *See, e.g.*, Douglas NeJaime & Reva B. Siegel, *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516 (2015); Mary Anne Case, *Why "Live-And-Let-Live" is not a Viable Solution to the Difficult Problems of Religious Accommodation in the Age of Sexual Civil Rights*, 88 S. Cal. L. Rev. 463 (2015); Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. Ill. L. Rev. 839; William P. Marshall, *Bad Statutes Make Bad Law: Burwell v Hobby Lobby*, 2014 Sup. Ct. Rev. 71; Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249 (1995).

---

[29] "[T]hat one legislature cannot abridge the powers of a succeeding legislature" and, thus, "one legislature is competent to repeal any act which a former legislature was competent to pass" is a foundational principle that "can never be controverted." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135, 3 L. Ed. 162 (1810). RFRA's protections are statutory, not mandated by the Constitution. Should it wish to do so, Congress remains free to alter the scrutiny to be applied to any particular law challenged under RFRA or to repeal RFRA altogether.

Judicial declarations that the sky will fall if exemptions were granted to religious objectors in a pluralistic society as diverse and vibrant as the United States are old hat as well.  Consider the following statement of Chief Justice Morrison Waite, written almost one hundred and fifty years ago:

> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. … Can a man excuse his practices to the contrary because of his religious belief?  To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.  Government could exist only in name under such circumstances.

*Reynolds v. United States*, 98 U.S. 145, 166–67, 25 L. Ed. 244 (1878).  After more than a century of wrestling with the First Amendment's Free Exercise Clause, the Supreme Court brought constitutional religious-accommodation doctrine full circle in *Smith*, upholding without accommodation neutral laws of general applicability.  Writing for the majority, Justice Scalia echoed Chief Justice Waite's sentiment:

> If the "compelling interest" test is to be applied at all, then, it must be applied across the board, to all actions thought to be religiously commanded.  Moreover, if "compelling interests" really means what it says (and watering it down here would subvert its rigor in the other fields where it is applied), many laws will not meet the test.  *Any society adopting such a system would be courting anarchy*, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them.

*Smith*, 494 U.S. at 888, 110 S. Ct. at 1605 (emphasis added).  It is hard to fathom a plainer statement of the risks of reinstituting a policy of religious accommodation.

Yet it was against this very backdrop that Congress enacted RFRA in 1993. And Congress specifically declared that by adopting the demands of strict scrutiny it intended to depart from the less-protective constitutional standard announced in *Smith*. *See* 42 U.S.C. § 2000bb(4). To the extent that the standard RFRA imposes raises policy concerns, criticisms on this front are best addressed to Congress, and may find appropriate shelter in the pages of law reviews. But as federal judges we are duty-bound to follow and apply the laws Congress actually enacted, not as we might wish them to be. "The wisdom of Congress's judgment on this matter is not our concern. Our responsibility is to enforce RFRA as written, and under the standard that RFRA prescribes," *Hobby Lobby*, 573 U.S. at __, 134 S. Ct. at 2785, the accommodation, no less than the contraceptive mandate itself, imposes a substantial burden on religious exercise.

## B.

Second, the majority fails to appreciate the crucial role in providing religiously objectionable contraceptive coverage that the accommodation foists on eligible organizations. The majority believes that the accommodation places no burden on the beliefs of Eternal Word Television Network and the Dioceses because the "significance they attribute to this act [of opting out]" is misguided, and thus the outcome of this case is not controlled by the otherwise-identical analysis in *Hobby Lobby*. *See ante* at 42. According to the majority, "[t]he ACA

130

and HRSA guidelines" are what "entitle women who are plan participants and beneficiaries covered by group health insurance plans to contraceptive coverage without cost sharing"—"not the opt out." *See id.* at 43–44 .  This is so even though the majority "acknowledge[s] that an eligible organization's act of [opting out] results in the TPA's designation as the plan administrator" under ERISA and "may be an incidental cause of contraceptive coverage being provided." *Id.* at 44–45.  Boiled down to its bare essentials, the majority's position is that if the parties really understood what is going on, they would have no basis to object to their role in the contraceptive mandate's regulatory scheme.

It is the majority, however, that misunderstands the contraceptive mandate.  Under its regulatory scheme, as bounded by the statutory requirements of the ACA and ERISA,[30] the Government becomes empowered to require contraceptive coverage for an eligible organization's self-insured health plan *only if* that organization affirmatively opts out under the accommodation.  A third-party administrator of a self-insured health plan "bears the legal obligation to provide

---

[30] Some doubts have been raised as to the Government's exact ability to require third-party administrators to comply with the contraceptive mandate within the scope of its regulatory authority.  *See Sharpe Holdings, Inc. v. U.S. Dep't of Health and Human Servs.*, 801 F.3d 927, 941–42 (8th Cir. 2015).  To the extent such doubts linger, they are of no moment here.  "We need look no further than to the government's own litigation behavior to gauge the importance of self-certification in the regulatory scheme. If [third-party administrators] had a wholly independent obligation to provide contraceptive coverage to religious objectors' employees and plan beneficiaries, there would be no need to insist on … compliance with the accommodation process." *Id.* at 942.

131

contraceptive coverage *only upon receipt of a valid self-certification.*"[31]  *Wheaton College v. Burwell*, 573 U.S. __, __ n.6, 134 S. Ct. 2806, 2814 n.6, 189 L. Ed. 2d 856 (2014) (Sotomayor, J., dissenting) (emphasis added).  The majority is incorrect, then, to say that the contraceptive mandate "does not turn on whether [an] eligible organization employer chooses to comply with the law."  *See ante* at 44.  Federal law kicks in only after an eligible organization acts; should an eligible organization decline to do anything, the Government lacks an independent means to ensure the provision of contraceptive coverage.  Because the regulations condition the provision of contraceptive coverage on eligible organizations' affirmative participation, their participation is the linchpin on which the contraceptive mandate rests.

To draw an analogy with which any first-year law student should be well acquainted, an eligible organization's opting out under the accommodation is both an actual and proximate cause of the provision of contraceptive coverage.  There can be no doubt that opting out under the accommodation is a "cause in fact" of providing contraceptive coverage.  But for opting out, the Government would lack the requisite regulatory authority over the third-party administrators of the organizations' health plans.  *Cf. Stacy v. Knickerbocker Ice Co.*, 54 N.W. 1091

---

[31] Under the regulations currently in force, a valid self-certification is either Form 700 or the alternative notice sent to the Secretary of Health and Human Services.  45 C.F.R. § 147.131(b)(3), (c).

(Wis. 1893) (noting that without defendant's cutting and removing of surface ice, uncontrolled horses would not have fallen through a frozen lake).  The majority contests whether the act of opting out also meets some standard of "legal" or "proximate" cause.  *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 104 (N.Y. 1928) (Andrews, J., dissenting) ("What we do mean by the word 'proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.  That is not logic, it is practical politics.").  According to the majority, because federal law entails the authorization to require third-party administrators to provide contraceptive coverage, opting out is only "an incidental cause of contraceptive coverage being provided." *See ante* at 44–45.

I fail to see, however, how affirmatively opting out of the contraceptive mandate under the accommodation could be deemed anything other than a "substantial factor" or "material concurring cause" directly leading to the provision of religiously objectionable coverage.  *Anderson v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co.*, 146 Minn. 430, 436–37, 439 (1920).  Opting out under the accommodation sets in motion a chain of events leading to the provision of contraceptive coverage as inexorably as night follows day.[32]  Once an employer

---

[32] Eternal Word Television Network and the Dioceses object only to their own, government-mandated participation under the contraceptive mandate.  They do not—and indeed

133

opts out, only then does the Government become authorized to regulate third-party

administrators.  *See Grace Sch. v. Burwell*, 801 F.3d 788, 808 (7th Cir. 2015)

(Manion, J., dissenting) (describing "the accommodation's tangled mess" as "the

long and winding extension cord the government uses to power its contraceptive

mandate").  So authorized, there can be no doubt that the Government will in turn

flex its newfound regulatory muscle to require the provision of contraceptive

coverage.

---

cannot—seek "to require the Government *itself* to behave" in accordance with their beliefs.  *See Bowen v. Roy*, 476 U.S. 693, 696–700, 106 S. Ct. 2147, 2150–52, 90 L. Ed. 2d 735 (1986) (denying relief to Abenaki man objecting on religious grounds to the Government's "'use'" of his daughter's already-issued Social Security number).  The majority's reliance on *Bowen* and its ilk is, therefore, inapposite.

Likewise inapposite is the Majority's analogizing the accommodation to the process used by conscientious objectors to opt of a military draft.  *See ante* at 46.  As Judge Manion puts it in his thorough debunking of this familiar trope,

> This is not like the case of a conscientious objector who objects and the government finds a replacement.  Under the regulations, the government does not find the replacement, the nonprofit does.  The designation does not take place unless the nonprofit either delivers the self-certification form to its insurer or TPA, or uses the alternative notice to inform the government who its insurer or TPA is and which health plan is at issue.  By insisting that the nonprofit deliver the form or supply the plan information for the government's use, the government uses the objecting nonprofit to do its dirty work.  The government has not provided an exit—it offers a revolving door with only one opening.
> . . .
> This is not the case of a conscientious objector walking into the draft board, voicing his objection, being excused, and walking out.  For the analogy to fit the HHS accommodation, the draft board must decide that every objector will be replaced by the objector's friend, and the objector's objection is only effective if the objector delivers written notice of his objection to his friend or tells the draft board who his friend is and where the board can find him.  Then, the objector must send his friend money so that his friend will remain his friend for the purpose of being his replacement.

*Grace Sch. v. Burwell*, 801 F.3d 788, 812 & n.11 (7th Cir. 2015) (Manion, J., dissenting).

This clear and uninterrupted causal chain holds whether an employer sends Form 700 directly to its third-party administrator or submits less-formal notice indirectly to the Secretary of Health and Human Services, just as a pilot reaches his destination as certainly flying direct as with a layover.  An employer connecting these dots would hardly need the insight of Henry Friendly to conclude that its actions caused, in a direct and material fashion, the religiously objectionable outcome.  "After all, if the form were meaningless, why would the Government require it?"  *Priests for Life v. U.S. Dep't of Health and Human Servs.*, Nos. 13-5368, 13-5371, 14-5021, 2015 WL 5692512, at *17 (D.C. Cir. May 20, 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc)

But this analogy can be stretched only so far.  Common-law principles of causation, however fundamental to our legal heritage, are simply too unreliable a light to guide RFRA's substantial-burden analysis.[33]  Reading into RFRA some sort of proximate-cause limitation would reintroduce the exact same "attenuat[ion]" argument rejected by the Supreme Court in *Hobby Lobby* for "dodg[ing] the question that RFRA presents."  573 U.S. at __, 134 S. Ct. at 2777–78.  To do so would be an illegitimate foray into the realm of personal faith, and

---

[33] "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion [as defining 'proximate cause'].  Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement as to the best approach."  W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* § 41 at 263 (5th ed. 1984).

135

federal courts are "singularly ill equipped" to parse the moral reasoning and theological conclusions of religious believers, especially in light of secular judges' unspecified and almost certainly inconsistent determinations of legal causation. *Thomas*, 450 U.S. at 715, 101 S. Ct. at 1431.  No matter how elaborate the Rube Goldberg machine the Government manages to jerry-rig, it is simply not our place to decide for Eternal Word Television Network and the Dioceses their degree of complicity when forced to topple the initial domino.

Accordingly, for eligible organizations that object to opting out under the accommodation, the contraceptive mandate burdens their religious exercise to the same impermissible extent as the plaintiffs' in *Hobby Lobby*.

III.

Concluding that the contraceptive mandate substantially burdens Eternal Word Television Network's and the Dioceses' religious exercise does not end the matter.  The Government can still prevail if it is able to show that the contraceptive mandate is "in furtherance of a compelling governmental interest" and the accommodation is "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).

The Government fails to make this showing.  For purposes of this opinion, I assume that the accommodation serves "a legitimate and compelling interest in the

136

health of female employees."[34]  *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S.

__, __, 134 S. Ct. 2751, 2786, 189 L. Ed. 2d 675 (2014) (Kennedy, J., concurring).

There is no need to reach the merits of this assumed compelling interest, whatever

its exact nature, because the accommodation is not the least-restrictive means

capable of achieving any government interest that could conceivably be called

compelling.  *Accord id.* at __, 134 S. Ct. at 2779–80 (Alito, J.).

IV.

If the notion that the accommodation does not substantially burden religious

exercise is "[r]ubbish," *Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't*

*of Health and Human Servs.*, 756 F.3d 1339, 1347 (11th Cir. 2014) (William

Pryor, J., concurring), then the majority's further notion that the contraceptive

mandate passes RFRA's "exceptionally demanding" scrutiny is rubbish on stilts.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. __, __, 134 S. Ct. 2751, 2780, 189

L. Ed. 2d 675 (2014).  In codifying the familiar language of strict scrutiny—the

"most demanding test known to constitutional law," *City of Boerne v. Flores*, 521

U.S. 507, 534, 117 S. Ct. 2157, 2171, 138 L. Ed. 2d 624 (1997)—Congress erected

---

[34] I pause to note my skepticism of the Government's proposed gloss on the compelling interest allegedly served by the contraceptive mandate.  Providing "seamless" contraceptive coverage—that is, providing coverage without cost sharing or additional administrative hurdles—and identifying organizations that opt out of the contraceptive mandate appear to me to be derivative considerations of feasibility and administrative convenience rather than compelling interests in their own right.  As such, these considerations are better left to the least-restrictive-means prong of the RFRA inquiry.

RFRA as a mighty bulwark, entrenching against Government incursion the freedom of religious liberty throughout the United States Code. To surmount these protections, the Government has the burden of "show[ing] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at \_\_, 134 S. Ct. at 2780. Carrying this burden is no mean feat. "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. \_\_, \_\_, 135 S. Ct. 853, 864, 190 L. Ed. 2d 747 (2015) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815, 120 S. Ct. 1878, 1887, 146 L. Ed. 2d 865 (2000)) (alteration omitted).

So, is there a less-restrictive alternative of ensuring that the female employees of employers with religious objections to the contraceptive mandate nonetheless continue to receive cost-free access to the challenged services? Of course there is. As the *Hobby Lobby* majority observed: "The most straightforward way of doing this would be for the Government to assume the cost of providing" the objectionable contraceptive coverage. 573 U.S. at \_\_, 134 S. Ct. at 2780. Though the Court did not ultimately need to reach the question of whether direct Government provision of contraceptive coverage would constitute a less-restrictive alternative because the plaintiffs did not object to the accommodation, *id.* at \_\_, 1354 S. Ct. at 2780–82, we must do so here. And I fail

138

to see any reason why the Court's persuasive reasoning should not be adopted. The Government has not shown, as it must, that it would be able to provide the same access to contraceptive coverage to the same women *only if* it can force eligible organizations to violate their sincerely held religious beliefs.

Speaking bluntly, RFRA makes the Government put its money where its mouth is. I see nothing in RFRA's text or the subsequent case law that would allow the Government to claim a compelling interest without having to spend a single red cent to do anything about it. Significant here, the Government *must necessarily agree* that RFRA compels it to fund contraceptive coverage otherwise the accommodation would not exist at all. Indeed, the *entire purpose* of the accommodation is to make the provision of contraceptive coverage independent of the eligible organization, including segregating all the costs paid by the eligible organization from all the expenditures for the objectionable services. Aware of the fallacy of free-lunch thinking and absent any expectation of third-party administrators acting out of purely eleemosynary impulse, the Government committed itself to funding contraceptive coverage for certain religious objectors,[35] albeit in roundabout fashion.

---

[35] Notably, the Government *did not* similarly commit itself to fund contraceptive coverage for female employees of other employers with religious objections—either churches and church-affiliated organizations or eligible organizations that maintain self-insured health plans but do not use a third-party administrator. Nor did the Government commit itself to fund

To be clear, the Government is *already* committed to fund the contraceptive mandate under the current regulations. The Government reimburses third-party administrators required to fund contraceptive coverage through a reduction in Federally-facilitated Exchange user fees, the amount of money paid to be able to offer insurance products on exchanges established by the Government under the ACA.[36] Money is fungible; the Government finds itself in the same financial position whether it declines to collect a tax liability of $500 or whether it collects the $500 and then immediately refunds the same. By forgoing revenue to fund the contraceptive coverage for the female employees of eligible organizations that opt out under the accommodation, the Government is effectively paying for the objectionable coverage. And in contrast to the half-measure of the accommodation—which covers only a limited set of religiously objecting employers and does not provide access to the female employees of churches and church-affiliated organizations, employers with grandfathered health plans, or

contraceptive coverage for female employees of employers with grandfathered plans or employers with fewer than fifty full-time employees.

Though there may be some level of backstop coverage provided by the other provisions of the ACA and Title X, *see infra* n.36, the Government's failure to extend its largesse to these women may also call into question the contraceptive mandate's asserted compelling interest—which, again, I assume the Government would be able to show—but certainly raises an obvious question: If the Government is able and willing to pay for some women to receive access to contraceptive coverage, why would it not be a less-restrictive means to do so in a more straightforward manner for all women at risk of being denied such access?

[36] As discussed above, third-party administrators may either reduce their own Federally-facilitated Exchange user fees if they are also in the business of selling insurance or they may enter into a contractual arrangement with another insurer to recoup that insurer's user fees. *See* 80 Fed. Reg. at 41328.

140

employers with fewer than fifty full-time employees[37]—providing for

contraceptive coverage directly without the accommodation's administrative

rigmarole would allow the Government to offer cost-free access to each and every

woman in the United States should it choose to do so.  And the Government has

failed to shoulder its burden to show that it would be unable to grant women access

to contraceptive coverage without the coerced involvement of Eternal Word

Television Network and the Dioceses.

Again, this straightforward application of well-established legal principles

should carry the day.  But, again, the majority thinks otherwise.  Specifically, the

majority concludes that the current iteration of the contraceptive mandate has

finally hit upon the least restrictive means of achieving the Government's

compelling interest when "the cost to the government" and "the burden the

alternatives impose on the affected women" are taken into account.  *See ante* at 63.

Though I do not dispute that these concerns are relevant to the least-restrictive-

---

[37] For female employees whose health plans are not subject to the contraceptive mandate, the Government has stitched together a patchwork safety net under Title X and other provisions of the ACA.  The record does not reveal how many women who would otherwise lack access to contraceptive services are eligible for coverage under this makeshift framework.  Nor does the record reveal whether there are hundreds, thousands, or millions of women who will continue to go without such access, with or without the accommodation.  Though a less-restrictive means need not be a perfect means, strict scrutiny demands that the Government's chosen solution must be "neither seriously underinclusive nor seriously overinclusive." *Brown v. Entm't Merchants Ass'n*, 564 U.S. __, __, 131 S. Ct. 2729, 2741–42, 180 L. Ed. 2d 708 (2011).

means inquiry, I cannot agree with the majority that they save the contraceptive mandate from RFRA's exceptionally demanding scrutiny.

The arguments advanced in the majority's apology for the contraceptive mandate seem to rest largely on speculative and overblown logistical problems the Government might face if it were held responsible for furthering its asserted compelling interest. According to the majority, if the Government were forced to provide contraceptive coverage "outside the existing, largely employer-based, insurance system," whether directly or through tax credits, "Congress would need to pass legislation that would fundamentally change how the majority of Americans receive" contraceptive coverage specifically, if not healthcare generally. *See id.* at 66–67. Likewise, if forced to keep the current model of providing contraceptive coverage through eligible organizations' health plans, "the government would be hamstrung" because of the "gaps" in institutional knowledge that would spring up regarding which female employees of which employers would be covered by the Government and which are not. *Id.* at 72. As a result, because the majority believes that adopting any of the alternatives it considers would incur various administrative and transactions costs, the result would be less access to contraceptive coverage, undermining the Government's asserted compelling interest. *See id.* at 70–71, 74.

The majority's insistence on assuming a virtually immutable regulatory and statutory status quo is fundamentally misplaced.  RFRA makes clear that it is the "*Government*" that "shall not substantially burden a person's exercise of religion," 42 U.S.C. § 2000bb-1(a) (emphasis added), not just constituent parts acting within their respective spheres of authority.  In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, for example, the Supreme Court specifically rejected the Government's position "that the Controlled Substances Act is [not] amenable to *judicially crafted* exceptions [for the hallucinogen hoasca]" because of "the existence of a *congressional* exemption for peyote."  546 U.S. 418, 434, 126 S. Ct. 1211, 1222, 163 L. Ed. 2d 1017 (2006).  It would be absurd to say, then, that we cannot grant a *judicially crafted* exception here because the relevant administrative agencies lacked the *regulatory* authority to promulgate exceptions that would have been equally effective in achieving an allegedly compelling interest had there been *congressional* action allowing them to do so.  In short, if *the Government as a whole* has a less-restrictive alternative available, the Government must use it.

The majority's radically revisionist account of RFRA, in contrast, would limit the universe of less-restrictive means to what *the Executive Branch* can accomplish unilaterally by administrative fiat.  This is a shocking reversal of our Constitution's prime directive:  "All legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  To the extent

143

that the Government claims an interest of the highest order, it is only reasonable

that Congress be expected to pitch in when freewheeling regulators encounter

statutory roadblocks. The practical hurdles to providing the access to

contraceptive coverage the Government seeks would simply disappear if Congress

were to slightly tweak the contraceptive mandate's statutory authorization under

ERISA and the ACA. By having Congress eliminate the need for eligible

organizations to affirmatively designate the third-party administrators of their

health plans—thus becoming directly involved in the provision of the

objectionable coverage—the Departments of Labor, Treasury, and Health and

Human Services would no longer need to substantially burden eligible

organizations by putting them to the "choice" of affirmatively violating their

sincerely held beliefs or paying massive penalties. And the Government has failed

to show why this could be accomplished without imposing any additional burden

on female employees only if eligible organizations were required to use the

accommodation.[38]

---

[38] To the extent that there may be additional administrative costs incurred in crafting an appropriately tailored exception to the contraceptive mandate, RFRA contemplates such costs and places them squarely on the Government's shoulders. Even if the Government were to require female employees of exempt employers to fill out the sort of all-too-familiar paperwork associated with receiving health insurance, such a "burden"—in contrast to being forced to either violate a sincere religious conviction or face steep monetary penalties—would be, at most, "de minimis." *Cf. Catholic Health Care Sys. v. Burwell*, 796 F.3d 207, 220 (2d Cir. 2015).

Finally, the fate of the contraceptive mandate under RFRA is complicated by the Government's decision to condition benefits flowing to third parties on actions taken by religious objectors in violation of their beliefs. I agree that granting an exemption that would impose costs on third parties could, under certain circumstances, run afoul of the Establishment Clause of the First Amendment. *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334–35, 107 S. Ct. 2862, 2868, 97 L. Ed. 2d 273 (1987) ("At some point, accommodation may devolve into 'an unlawful fostering of religion.'" (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145, 107 S. Ct. 1046, 1051, 94 L. Ed. 2d 190 (1987))). But such an eventuality alone does not automatically transform the Government's chosen means into the least-restrictive alternative required by RFRA. As the Supreme Court reiterated in upholding the constitutionality of RLUIPA, RFRA's sister statute, "'there is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713, 125 S. Ct. 2113, 2117, 161 L. Ed. 2d 1020 (2005) (quoting *Locke v. Davey*, 540 U.S. 712, 718, 124 S. Ct. 1307, 1311, 158 L. Ed. 2d 1 (2004)). Granting Eternal Word Television Network and the Dioceses an exemption from

the contraceptive mandate falls well within the space allowed for "play in the joints," wherever those exact boundaries may lie.

Here, the Government is essentially asking for a free pass on RFRA's least-restrictive-means requirement because the administrative agencies responsible for crafting the contraceptive mandate decided—for administrative convenience—to tie the provision of contraceptive coverage to eligible organizations' affirmative participation in an elaborate regulatory scheme. If we were to honor the Government's request, anytime regulators wanted to immunize their slapdash efforts, regardless of the potential alternatives, they need only condition a benefit to third parties on any substantial burden placed on religious exercise. Lest RFRA is understood to have ushered in the apotheosis of the administrative state, surely the rigorous standard of strict scrutiny cannot be so easily evaded.

Without a doubt, there are sundry ways for the Government to provide women with cost-free access to contraceptive coverage. The administrative agencies tasked with promulgating the regulatory structure that undergirds the contraceptive mandate chose, because of convenience and their bounded statutory authority, to do so in a manner that substantially burdens religious adherents. We have been presented insufficient evidence to hold that the goal of increasing access to contraceptive coverage could be reached only through the circuitous regulatory pathways that have been cobbled together here. The Government, therefore, has

146

failed to carry its burden to show that the contraceptive mandate is the least restrictive means of furthering any assumed compelling interest.

V.

The sweeping protections for religious exercise Congress contemplated when it enacted RFRA should not be denied to Eternal Word Television Network and the Dioceses.  RFRA's text and purpose, as confirmed by well-established precedent, extend these protections to religious adherents forced to choose between affirmatively participating in a regulatory scheme that they sincerely believe would make them complicit in denigrating the sanctity of human life and paying millions of dollars in noncompliance penalties.  Because the Government cannot show that the latest iteration of its constantly evolving "accommodation" survives strict scrutiny, RFRA bars enforcing the contraceptive mandate against those employers whose religious exercise it substantially burdens.

By concluding otherwise, the majority diminishes the full range of religious liberty that Congress sought to protect when it enacted RFRA.  Recasting and enfeebling RFRA's standard as nothing more than "good enough for government work" is a far cry from strict scrutiny's typical charge of *fiat justitia ruat caelum*.[39] Perhaps the majority's desire to bring RFRA's statutory protections for religious liberty closer in line with the less-demanding constitutional standard represents a

_____

[39] *Let justice be done though the heavens may fall.*

147

superior policy judgment.  Perhaps not.  In any event, the majority's application of "water[ed] down" strict scrutiny is exactly the sort of wishy-washy treatment likely to "subvert its rigors in the other fields where it applies" that motivated the Supreme Court's *Smith* decision in the first place.  *See Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 888, 110 S. Ct. 1595, 1605, 108 L. Ed. 2d 876 (1990).  But by enacting RFRA, Congress confirmed that strict scrutiny "really means what it says."  *Id.*; *see also Hobby Lobby*, 573 U.S. at __ n.3, 134 S. Ct. at 2761 n.3.  Regardless of individual judges' views of the wisdom motivating RFRA, that was Congress's call to make.

Respectfully, I DISSENT.